**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

IN THE MATTER OF CHESTER J.         CIVIL ACTION
MARINE, LLC, AS OWNER AND
OPERATOR OF THE M/V CECILE A.
FITCH, OFFICIAL NO. 297854            NO. 20-214-JWD-SDJ

**RULING ON MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL
OF CLAIMS AGAINST YAZOO RIVER TOWING, INC.**

Before the Court is the *Motion for Summary Judgment Seeking Dismissal of Claims Against Yazoo River Towing, Inc.* ("Motion") brought by Petitioner in Limitation Yazoo River Towing, Inc. ("YRT"). (Doc. 155.) It is opposed by claimant Charlotte Standridge, individually and as personal representative of the Estate of Lloyd Standridge, Ashley Standridge and Aaron Standridge ("Standridge Claimants") (Doc. 187) and Limitation Complainant and Claimant Chester J. Marine, LLC ("CJM") (Doc. 189). YRT filed a reply. (Doc. 224.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Motion is denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the February 10, 2020, death by drowning of two members of the crew of M/V MELVIN KING (the "KING"): Lloyd Ray Standridge ("Standridge") and Norsalus Jackson ("Jackson"). Standridge's survivors sued CJM, Yazoo, and others in state court and requested a jury trial. (Doc. 54-1 at 2; Doc. 61 at 3.) CJM and Yazoo filed separate limitation of liability actions in this Court, (Case No. 20-cv-214, Doc. 1; Case No. 20-cv-252, Doc. 1), which were consolidated on July 17, 2020, (Case No. 20-cv-214, Doc. 21). Following the filing of these two actions, the state court suit was stayed. (Case No. 20-cv-214, Doc. 6; Case No. 20-cv-252, Doc. 5-2.)

The Standridge Claimants brought claims in both limitation actions, (Case No. 20-cv-214, Doc. 13; Case No. 20-cv-252, Doc. 13). Shayla Wright ("Wright"), Norsalus Jackson's sister and the

1

personal representative of his estate, also filed a claim in both limitation proceedings. (Case No. 20-cv-214, Doc. 51; Case No. 20-cv-252, Doc. 19.)[1]

CJM asserted a claim against YRT, (Case No. 20-cv-214, Doc. 25 at 8–12); YRT filed a claim against CJM and the M/V Cecile A. Fitch (the "FITCH") *in rem* (*id.*, Doc. 20 at 10–11); CJM and YRT filed third party claims against Jack Miller's Landing, LLC d/b/a Jack Miller's Landing and J's Lounge ("JML"), the owner of the bar where Standridge and other members of the crew allegedly became intoxicated before the accident, (Docs. 68 and 69).[2]

The KING is an inland push boat owned and operated by YRT. (Doc. 148-1 at 1–2, # 5; Doc. 185-1 at 1, # 5; Doc. 192-1 at 2, # 5.) On February 10, 2020, the KING was manned by a crew of six: Standridge (captain or pilot), Billy Evans ("Evans") (captain or pilot),[3] Jamie Lee May ("May") (mate), Shannon Lashbrook ("Lashbrook") (engineer), William Austin Winemiller ("Winemiller") (deckhand) and Jackson (deckand). (Doc. 148-1 at 2, # 6; Doc. 185-1 at 1, # 6; Doc. 192-1 at 2, # 6; *see also* Doc. 148-5 Log Book, at 1500 hours.)

At approximately 5:35 p.m. on February 10, 2020, four crewmembers of the KING (Standridge, May, Winemiller and Jackson) boarded the KING's skiff and travelled to Jack Miller's Landing/J's Lounge ("Jack Miller's"). (Doc. 148-1 at 2, # 12; Doc. 185-1 at 2, # 12; Doc. 192-1 at 3, #12.)[4] Jack Miller's is a convenience store and bar located some distance north of where the KING was waiting for her turn to pass through the Bayou Sorrel locks. (YRT's Statement of Uncontested Material Facts ("YRT SUMF"), Doc. 155-2 at 2, # 8).[5]  At the time, Standridge was a U.S. Coast

---

[1] Wright originally joined with the Standridge Claimants in their opposition to YRT's Motion for Summary Judgment but since has settled and the claim was dismissed. (Docs. 230, 231.)

[2] JML's unopposed Motion for Summary Judgment (Doc. 151) was granted (Doc. 232), and it is no longer a party.

[3] Standridge and Evans were both licensed masters (Doc. 175-22, Evans Dep., at 42, 43; Doc. 228 at 8, # 29, Pretrial Order, Established Facts) but, as is discussed in detail *infra*, the parties dispute and there is conflicting evidence as to who was acting as captain in charge at the critical times involved.

[4] YRT disputes that 5:35 p.m. was the "exact" time but concedes that Winemiller testified they left for Jack Miller's at around 5:35 or 5:40 p.m. (Doc. 192-1 at 3, # 12.)

[5] Unless stated otherwise, reference to YRT's SUMF (Doc. 155-2) means that the matter is admitted by the two opponents of the Motion or is qualified in a way which does not affect the correctness of the statement citing the SUMF.

Guard licensed master (Doc. 228 at 8, # 29, Pretrial Order, Established Facts) and was, on the evening in question, either the master-in-command, the relief pilot, or (with Evans) co-master in command.[6] The positions of the three other crew members on the skiff were Jackson (a licensed seaman and deckhand), May (a licensed tankerman serving as the vessel's mate), and Winemiller (a deckhand).[7] They all possessed the requisite U.S. Coast Guard credentials required for their positions. (Doc. 228 at 8, # 29, Pretrial Order, Established Facts.)

A video taken at Jack Miller's shows that they arrived at Jack Miller's at around 5:49 p.m. video time (Doc. 155-20, introduced manually at Doc. 176)[8] and, while there, all four drank alcohol. (Doc. 155-2 at 2, YRT SUMF # 9.) "The four men remained at the bar until 7:51 p.m., video time, when the bartender felt they had had 'enough to drink' and 'kicked them out.'" (*Id*. at 3, YRT SUMF # 11.) At approximately 6:18 p.m., video time, the KING's engineer, Lashbrook  called May and told him that Captain Evans "was looking for them and to come back to [the KING]." (*Id*., YRT SUMF # 10.) Evans, like Standridge, was a licensed Master (Doc. 175-22, Evans Dep., at 42–43.) and was a trip pilot for YRT (*id*. at 11–12). There is also testimony that Evans called May directly and told May to bring Evans some crawfish from Jack Miller's. (Doc. 175-16, May Dep., at 178.)

May was driving the skiff as they returned to the KING. (Standridge Claimants' Additional Statement of Facts in Support of the Claimants' Joint Opposition Memorandum, ("SCASF") #34, Doc. 187-1 at 15; Doc. 224-3 at 9.) YRT and Standridge claim that before they reached the KING,

---

Here, the only dispute is as to the exact distance between the KING and Jack Miller's which is irrelevant for purposes of the Motion.

[6] As is discussed *infra*, there is conflicting evidence as to who was the Captain in charge of the KING at the time of the casualty. Captain Billy Evans testified that, on February 6, 2020, he relieved Captain Timothy Chisolm and assumed Chisolm's role as co-Captain. (Doc. 175-22, Evans Dep., at 267–68.)

[7] (Doc. 155-2 at 2, # 7; Doc. 187-1 at 3–4, # 7; Doc. 189-1 at 2, # 7.) While the parties disagree regarding YRT's statement that the crew members left "without permission", they do not dispute the respective positions of the crewmembers.

[8] There is an approximate 30-minute difference between the video time (which is earlier) and other recorded times. *Compare, e.g.*, the video of Lashbrook's call to May (filed conventionally at Exhibit 16 to the Motion, Doc. 156) *with* Lashbrook's testimony that the call was made at 6:46 p.m. (Doc. 175-10 at 76–78; see also Doc. 155-2, YRT SUMF # 10.) This time difference is not critical to the Court's ruling.

the skiff "collided head-on with the northbound [FITCH] pushing six empty barges." (Doc. 155-2 at 3, YRT SUMF # 13; Doc. 187-1 at 4, Claimants' Joint Statement of Disputed Material Facts in Opposition to Yazoo River Towing, Inc.'s Motion for Summary Judgment ("Standridge's SDMF") # 13.) CJM denies such a collision occurred, contending "a dispute of material facts exists as to whether its vessel, the [FITCH], was involved in an incident with the skiff." (Doc. 189-1 at 2, Chester J. Marine, LLC's Reply to Yazoo River Towing, Inc.'s Statement of Contested Material Facts ("CJM RSMF") # 13.) According to CJM, the skiff "either swamped or struck an object in the water." (Doc. 109 at 3.)

Tragically, Standridge and Jackson drowned in the incident.

## II.    ARGUMENTS OF THE PARTIES

### A.  YRT

YRT claims it is entitled to summary judgment for two main reasons. First, the four YRT employees involved in the incident were not within the course and scope of their employment, a fact, YRT argues, that deprives the Standridge Claimants and CJM of the ability to succeed on their respective claims. (Doc. 155 at 1; 155-1 at 1, 9–17.) Second, "[t]he crewmen's rogue—and more importantly, unlawful—actions in operating the skiff after a drinking excursion are undeniably a superseding cause that would break any chain of causation (even assuming one existed) as to YRT." (Doc. 155 at 2; *see also*, Doc. 155-1 at 2, 17–20.)

Regarding YRT's first argument, YRT maintains that, in order for either claimant to recover, "the four YRT employees must have been in the course and scope of their employment." (Doc. 155-1 at 9, citing *Beech v. Hercules Drilling Co., LLC*, 691 F.3d 566, 570 (5th Cir. 2012) and *Ebanks v. United States*, No. 12-743, 2013 WL 2243839, at *6 (E.D. La. May 21, 2013). The test in the Fifth Circuit for determining whether a worker was in the course and scope of his employment is whether "his actions at the time of an injury were <u>in furtherance of his employer's business interests</u>." (Doc.

155-1 at 10, quoting *Beech*, 691 F.3d at 574 (emphasis in briefing).) "[I]n order for an activity to qualify as being within the course and scope of employment, it must be a necessary incident of the day's work or be essential to the performance of the work." (*Id.*, quoting *Beech*, 691 F.3d at 574, in turn quoting *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 634 (7th Cir. 2005).) Furthermore, when the negligence of a co-employee is urged as the basis for liability, both the plaintiff and the alleged tortfeasor must have been within the course and scope of their employment for the putative employer to be liable. (*Id.*, citing *Beech*, 691 F.3d at 574.)

YRT insists that the four YRT employees on the skiff were not in furtherance of YRT's business and thus not within the course and scope of their employment prior to and at the time of the incident because 1) they left the KING without permission and were using the skiff for an unauthorized purpose ("namely to consume alcohol") (*id.*); 2) they refused to return to the KING after having been told to do so (*id.* at 10–11); 3) "[t]heir actions were directly contrary to YRT's explicit policies, of which they were all expressly aware" (*id.*);[9] 4) their actions violated Coast Guard regulations (*id.*); and 5) their reasons for going to the bar were purely personal (*id.* at 11–13). The fact that they were returning to the KING at the time of the event does not, argues YRT, bring them back into the course and scope of their employment. (*Id.* at 13–14, citing *Park v. Alakanuk Native Corp.,* No. A90-305 CIV(JAV), 1994 WL 780707 (D. Alaska Mar. 16, 1994).)

YRT contends that, even if they were in the course and scope of their employment, YRT is still entitled to summary judgment since the crewman's actions constitute a superseding and intervening cause of the accident. (*Id.* at 16–17, citations omitted.). Finally, despite Plaintiff's allegations to the contrary, "[t]he undisputed evidence shows that the accident was not caused by any alleged unseaworthiness of the skiff." (*Id.* at 17; *see also id.* at 17–20.)

---

[9] The policies alleged by YRT to have been violated are the policy regarding the skiff's use (Doc. 155-2 at 1, # 2); the policy that crewmembers cannot leave the vessel without permission (*id.*, # 3); and the policy prohibiting the use of alcohol while on duty or on the vessel (*id.*, # 1).

### B. Standridge Claimants

In their opposition, the Standridge Claimants argue generally that each of the so-called undisputed facts are actually "riddled with genuine issues of material fact [and] a formidable body of record evidence entirely disproves them." (Doc. 187 at 4.) These Claimants maintain that the "known" policy the crew is supposed to have violated (specifically, the "skiff use policy") was "far from 'known' " (*id*. at 5) and that the actual practices aboard the KING "undermined this theoretical policy completely" (*id*. at 6). To the extent the YRT skiff use policy was not followed, it was because of YRT's failure to properly train its employees (*id*.; *see also id*. at 8–11) and YRT's approval of a "vessel-wide practice that [was] **contrary** to its policy" (*id*. at 6).

There are questions of fact as to whether YRT policies were violated at all, argue the Standridge Claimants. (*Id*. at 6–8, using as an example, the policy which allowed "the Captain and/or the office" to give permission to use the skiff and that Standridge, at least one of two acting captains, authorized its use.) Furthermore, contrary to YRT's position, there is evidence to support the conclusion that "the skiff crew's trip to Jack Miller's Landing was 'in the service of the ship' or 'in furtherance of [YRT's] business interests,'" for three reasons: first, seamen relaxing on shore promote the employer's business interests and this is a necessary part the sailing of vessels. (*Id*. at 11–26, citing, among other cases, *Aguilar v Standard Oil Co. of N.J.,* 318 U.S. 724, 732–34 (1943).) Second, the fact that the crew members were admittedly intoxicated does not change this basic principle. (*Id*. at 12.) Third, even while at Jack Miller's Landing, the crew "was still answerable to Captain Billy Evans' orders." (*Id*. at 13.)

The Standridge Claimants dispute YRT's suggestion that the conduct of the skiff's crew was a superseding cause (*id*. at 14–19), giving five reasons. First, "there is no evidence whatsoever . . . that this crew's intoxication contributed to the incident in any way, shape or form." (*Id*. at 14.) Second, YRT's "liability stands *'irrespective of fault and irrespective of the intervening negligence of the*

***crew members***.'" (*Id*. at 15, quoting *Zilko v. Golden Alaska Seafoods, Inc*., 123 Wash. App. 1020 (2004).) Third, since May was piloting the skiff at the time of the casualty and he was an employee of YRT, his negligence is attributable to YRT and cannot be a superseding cause of the accident. (*Id*. at 15–16.)

Fourth, "the superseding cause doctrine cannot apply if the party seeking to avoid liability 'should have realized' that the third party might act in the superseding manner." (*Id*. at 16, citations omitted.) This is precisely what happened here when Evans discovered the crew had left in the skiff. (*Id* at 16–17.) Fifth and finally, the intoxication of the crew members "is by law directly attributable . . . to [YRT]" . . . because of the "pervasive drinking culture" on the KING. (*Id*. at 18–19.)

On the issue of the unseaworthiness of the skiff, the Standridge Claimants argue that it was unseaworthy for various reasons including, *inter alia*, its failure to have a fully functioning engine, a trained crew, navigational lights for the vessel, and adequate policies regarding the skiff's use. (*Id*. at 19–23.) These claimants contend that YRT's "failures . . . violated Inland Navigation Rules 5 [33 C.F.R. § 83.05] and 8 [33 C.F.R. § 83.03] – triggering the Pennsylvania presumption that these violations contributed to this incident. . . ." (*Id*. at 22; *see also id*. at 24.)

### C. CJM

CJM makes arguments similar to those made by the Standridge Claimants. In addition, CJM notes that Captain Evans, who was aboard the KING during the operative times and clearly within the course and scope of his employment, was also negligent. After the skiff's crew failed to comply with Lashbrook's request to return to the KING, "Evans called May directly and requested that the group bring him crawfish from Jack Miller's." (Doc. 189 at 2.)

> Despite it being dark, Evans made no inquiry into whether the skiff was equipped with its portable navigation lights. Also, despite knowing that his crew were at Jack Miller's and having a suspicion they were drinking and "up to no good," he made no inquiry into whether the crew was fit to operate the skiff. During this time, Evans did not alert YRT's shoreside

> management that his crew was away from the vessel, or that he believed
> they may be drinking alcohol. Although it was dark and he did not know
> whether the skiff was equipped with navigational lights, Evans did nothing
> to alert area vessels that the KING's skiff would be on the dark waterway
> returning to the vessel.

(Doc. 189 at 2; *see also id*. at 14–21, where CJM details Evans' alleged negligence with supporting

record citations.)

CJM directs the Court's attention to *In re Gulf Pride Marine Service, Inc.*, No. 96-1104, 1997

WL 118394, at *7, 1997 U.S. Dist. LEXIS 3210, at *16-17 (E.D. La. Mar. 14, 1997) which it

contends is factually similar to the present case and supports a finding that, despite the inebriation of

the skiff's crew, they were within the course and scope of their employment for YRT. (*Id*. at 4–6.)

CJM points to facts in this record which mirror those in *In re Gulf Pride Marine Service, Inc.*, *supra*,

including that the skiff's crew were returning in a company vessel to the KING and under the control

of YRT's Captain Evans at the time of the event. (*Id*. at 7–8.) It echoes the argument made by the

Standridge Claimants that the YRT policies allegedly violated by the crew were policies which were

not enforced until after the incident. (*Id*. at 8–12.)

Using the case relied upon by YRT, CJM maintains that the conduct of the skiff's crew was

not a superseding cause of the accident because "YRT 'should have realized' the crew members

might have acted in this manner." (Doc. 189 at 13, citing *Donaghey v. Ocean Drilling & Exp. Co*.,

974 F.2d 646, 652 (5th Cir. 1982).) CJM argues that another case relied upon by YRT, *Park v.

Alakanuk Native Corp.*, No. A90-305(JAV), 1994 WL 780707 (D. Alaska Mar. 16, 1994), is

distinguishable from the present case. (*Id*. at 24.) Finally, CJM argues that YRT's post-accident

conduct "implies that its employees were in the course and scope of their employment." (*Id*. at 24–

25.)

### D. YRT's Reply

In its reply memorandum, YRT argues that "[c]ommon sense and established Fifth Circuit

precedent confirm . . ." that the skiff's crewmembers were not in the course and scope of their employment at the time of the casualty. (Doc. 224 at 1–2, itemizing items supporting its position.) It urges that the case relied upon by CJM, *In re Gulf Pride Marine Service, Inc.*, *supra*, was implicitly overruled by the Fifth's Circuit in *Beech v. Hercules Drilling Co.*, *supra*. (*Id*. at 2.) Furthermore, the facts relied upon by CJM in its effort to distinguish *Park v. Alakanuk Native Corp.* "do not command a different outcome here." (*Id*. at 3.)

YRT returns to *Beech* and insists that it supports its position that the skiff's crew members were outside the course and scope of employment even if they were returning to the vessel since the worker in *Beech* was found outside course and scope although he was "indisputably performing his assigned duties on the vessel at the time of the accident." (*Id*. at 5, citing *Beech*, 691 F.3d at 575.) Furthermore, the reliance by the Standridge Claimants and YRT on shore leave cases like *Aguilar v. Standard Oil Co. of New Jersey*, *supra*, to support their position fails because first, those cases are, unlike the present one, blue water seamen cases where the voyages were for extended time periods and second, this shore leave wasn't authorized. (*Id*. at 5–7.)

Regarding superseding cause, YRT argues that the case law cited by the Standridge Claimants is irrelevant to the causation issue and the crew members' intoxicated condition here breaks the chain of causation. (*Id.* at 7–8.) Furthermore, their argument that the intoxication played no role in the event "simply ignores the facts," including that the men failed to see or hear the barge it struck until it was a mere 15 feet from it. (*Id*. at 8.) YRT disputes that the evidence in any way suggests that Captain Evans should have foreseen the intoxication and other negligent conduct of the crew. (*Id*. at 9–10.) Finally, there is no evidence that the skiff's engine played any role in the collision. (*Id*. at 10.)

## III.    STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.    DISCUSSION

### A.  Seaman's Course and Scope of Employment - Standard

The Standridge Claimants bring their claim against YRT under the Jones Act, 46 U.S.C. § 30104 (Docket Number 20-252, Doc. 13 at 9–10, ¶ 4) and the general maritime law (*id*. at 11–12, ¶ 14) and against CJM under the general maritime law (Docket Number 20-214, Doc. 13 at 11–12, ¶ 14). In order to recover against YRT as Standridge's employer under the Jones Act, the Standridge Claimants must prove that Standridge "was injured within the course of his employment, and that his injury was caused by the negligence of his employer, the ship's master or a fellow employee." *Ebanks*, 2013 WL 2243839, at *6.

In order to recover against YRT based on the allegedly negligent acts of Standridge's fellow crew members, the Standridge Claimants must also prove that Standridge and these fellow crew

members were in the course and scope of their employment. *Beech*, 691 F.3d at 572 ("[I]n order to hold an employer vicariously liable under the Jones Act for one employee's injury caused by the negligence of a co-employee, a plaintiff must show that the injured employee and the employee who caused the harm were both acting in the course of their employment at the time of the accident.").

"[T]he Supreme Court has already held that the meaning of the term 'course of employment' under the Jones Act is equivalent of 'the service of the ship' formula used in maintenance and cure cases." *O'Berry v. Ensco Int'l, LLC,* No. 16-3569, 2017 WL 3594204, at *3 (E.D. La. Aug. 21, 2017) (citing *Daughdrill v. Diamond M. Drilling, Co.*, 447 F.2d 781, 783 (5th Cir. 1971) (citing *Braen v. Pfiefer Oil Transportation Co.*, 361 U.S. 129 (1959))). *See also Ebanks*, 2013 WL 2243839 at * 4 ("The term 'course of employment' has the same meaning as 'the service of the ship' formula used in maintenance and cure cases." (citations omitted)).

In *Beech v. Hercules Drilling Co.,* the Fifth Circuit established the test for course and scope of employment in the context of a Jones Act case:

> Today we make clear . . . that[,] regardless of whether the underlying injurious conduct was negligent or intentional, the test for whether a Jones Act employee was acting within the course and scope of his employment is whether his actions at the time of the injury were in furtherance of his employer's business interests.

*Beech,* 691 F.3d at 574; *see also Ebanks,* 2013 WL 2243839, at *4.

The Standridge Claimants argue that the fact the four crewmembers had gone ashore to relax and drink alcohol did not remove them from the course and scope of employment, (Doc. 187 at 12), relying on *Aguilar*, 318 U.S. 724, 732–47 and *Ebanks*, 2013 WL 2243839, at * 6. In *Ebanks*, John Ebanks was killed when the truck in which he was riding as a passenger struck a tree. *Id*. at * 1. At the time of the accident, he and the truck's driver were seamen returning to the ship from authorized shore leave and both were legally intoxicated. *Id*. Ebanks' survivor sued under the Jones Act, for unseaworthiness and for cure incurred between the time of his accident and his death. *Id*. Plaintiff

11

moved for partial summary judgment declaring that Ebanks and the driver were within the course and scope of their employment when the accident occurred. *Id*. at *2.[10]

The Court noted that traditionally, a seaman on "authorized shore leave during which he attend[s] to personal business" including "relaxation" on shore, is, with certain exceptions, considered to be within the course and scope of his employment. *Id*. "Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. *** In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion." *Id*. at *5 (quoting *Aguilar*, 318 U.S. at 734–35).

The court noted that the Fifth Circuit had recently declared the test for a seaman's course and scope of employment to be "whether [the seaman's] actions at the time of the injury were in the furtherance of the employer's business interests." *Id*. at *4 (quoting *Beech*, 691 F.3d at 574). But the Court concluded (again, with exceptions), that "[i]n light of the Supreme Court jurisprudence, the *Beech* 'business interests' standard does not constitute a new, more restrictive approach to the scope of employment analysis in shore leave cases. Put simply, seamen relaxing on shore leave do in fact promote their employers' business interests, at least as a general rule." *Id.* at *5.

This "general rule" is subject to two exceptions, specifically noted in *Aguilar*: "venereal disease and injuries caused by intoxication." *Id*. As to intoxication, the court in *Aguilar* stated that the exception of intoxication has "on occasion . . . been qualified in recognition of a classic predisposition of sailors ashore." *Id*. (quoting *Aguilar*, 318 U.S. at 731 (citations omitted)). The *Ebanks* Court quoted the Fifth Circuit's recognition of that "classic predisposition" of seamen to imbibe alcohol:

> The trend of the cases toward increased coverage for a seaman in the service of his ship and Justice Rutledge's suggestion in *Aguilar* that there are occasions when the court should bear in mind the

---

[10] There were three other motions before the Court that also hinged on the question of whether Ebanks and the driver were within the course and scope of their employment. *Ebanks*, 2013 WL 2243839, at *4.

> classic predisposition of sailors ashore seem to point toward
> judicial tolerance when seamen are injured while engaged in their
> own fun in a seaman's bar.

*Id.* at *6 (quoting *Dailey v. Alcoa S.S. Co.*, 337 F.2d 611, 612–13 (5th Cir. 1964) (cleaned up)). But

the Court also noted an important distinction: "Courts distinguish between a seaman whose

intoxication actually caused an injury and one who happens to be intoxicated at the time of an

injury." *Id.* The issue of course and scope therefore turned not on whether the two seamen were

intoxicated but whether the intoxication caused Ebanks' injuries and death.

On this central issue, the court found that the intoxication of the driver of the truck "caused

Mr. Ebanks' injuries and death" and therefore the driver "was not within the course and scope of his

employment." *Id.* By contrast, because Eubanks' intoxication was not a cause of the accident, he was

found to be within the course and scope of his employment. *Id.* at *7.

Also of note for our purposes was the Court's consideration of the plaintiff's argument that

the employer had fostered or condoned the crew's drinking.

> The Court is not persuaded by Plaintiff's argument that Defendants
> condoned the willful misbehavior of Mr. Demelio. Some evidence in the
> record indicates that other members of the crew consumed alcohol while
> on shore leave, but the Court finds no evidence to indicate that Defendants
> condoned drinking to excess in general, or, particularly applicable here,
> driving while intoxicated.

*Id.*

YRT responds first, that the *Aguilar* line of cases has been held by the Fifth Circuit to be

inapplicable to seamen who "return home on a regular basis after working on an inland vessel for

several weeks (not months)." (Doc. 224 at 6, citing *Sellers v. Dixilyn Corp.,* 433 F.2d 446, 448 (5th

Cir. 1970) (finding that the off-time of a rig worker "bore little resemblance to the shore leave of a

traditional blue water seaman," and refusing to apply authorized shore leave cases like *Aguilar*).)

Second, YRT maintains that even if this were a case of blue water seamen on a long voyage, *Aguilar*

and its progeny would not apply here because, unlike in those cases, the shore leave, *i.e.*, the trip to Jack Miller's, was not authorized. (*Id.*)

YRT is correct that the Fifth Circuit has drawn a distinction between so-called "commuter seamen," *i.e.*, "those who live at home and commute to work or who serve for a fixed period of time on a vessel and are then on shore for a period of time fixed or otherwise," 2 Robert Force and Martin J. Norris, *The Law of Seamen* § 30:34, (5th ed. 2021), and traditional blue water seamen who live on board for long periods of time. "The Fifth Circuit has stated that there are two factors to be considered in the 'commuter seaman' situation: (1) whether or not the seaman was on authorized shore leave when injured, and (2) whether or not the seaman was answerable to the call of duty." *Id.* In such cases,

> [t]he determination of whether a seaman is "in the service of the vessel" and "answerable to the call of duty" at the time of the accident depends on the particular facts and circumstances of each case. Nevertheless, it is clear as a matter of law that the seaman's answerability to the "call to duty" imports at the very least some binding obligations on the part of the seaman to serve . . . . The fact that a seaman is "answerable to the call of duty" imports a legal obligation both on the part of the seaman, enforceable by the shipowner, and on the part of the vessel, to pay him and provide maintenance and cure in times of illness or injury, enforceable by the seaman in courts of admiralty. It is because the seaman remains bound to the vessel that the vessel and the shipowner are correspondingly obligated to him for maintenance and cure in case of injury. These reciprocal obligations determine an individual's status as a seaman, and whether the seaman is in the service of his vessel.

*Baker v. Ocean Systems, Inc.* 454 F.2d. 379 (5th Cir. 1972) (finding that diver tender injured in pool hall fight was not in the service of the vessel when, at the time of injury, plaintiff was not under obligation to answer the call of duty from his employer, and his employer was under no obligation to reemploy him); *see also Sellers*, 433 F.2d at 448 (finding plaintiff was not on authorized shore leave nor was he answerable to the call of duty); *Daughdrill v. Diamond M. Drilling Co.*, 447 F.2d 781, 784 (5th Cir. 1971) (finding plaintiff's decedent "was neither on shore leave nor answerable to the

call of duty and was not within the course of his employment at the time of his death . . . [thus] . . . end[ing] the Jones Act claim.")

Whether a traditional blue water seaman or a commuter seaman, the overarching test in the Fifth Circuit remains "whether his actions at the time of the injury were in furtherance of his employer's business interests." *Beech*, 691 F.3d at 574. But the application of *Beech* in either kind of case does not require the abandonment of factors previously considered by courts and, in both, the outcome will necessarily vary depending on the specific facts of each case. As Judge Fallon stated in *Ebanks*, the "business interests" test "does not constitute a new, more restrictive approach to the scope of employment analysis in shore leave cases. Put simply, seamen relaxing on shore leave do in fact promote their employers' business interests, at least as a general rule." *Ebanks*, 2013 WL 2243839, at * 5. Similarly, for commuter seamen, the dual considerations of whether or not the seaman is on authorized shore leave and answerable to the call of duty at the time of injury remain factors in determining whether a seaman is serving his employer's business interests.

Utilizing these legal principles and the facts in the record, the Court must now determine whether there are any material issues of fact as to whether the crew of the skiff, at the time of the accident, was furthering the business interests of YRT.

### B. Seaman's Course and Scope - Application

While it is admitted that Standridge, May, Winemiller and Jackson had all consumed significant amounts of alcohol while at Jack Miller's Bar,[11] there remain significant issues of fact regarding whether the four occupants of the skiff were within the course and scope of their employment at the time of the casualty. Was the trip to Jack Miller's made with or without

---

[11] After leaving the KING and arriving at Jack Miller's bar, the crew drank alcohol (Doc. 155-2 at 2, YRT SUMF # 9), and "remained at the bar until 7:51 p.m., video time, when the bartender felt they had 'enough to drink' and 'kicked them out.'" (*Id*. at 3, YRT SUMF # 11.) May was driving the skiff on the night of the incident. (SCASF #34, Doc. 187-1 at 15; Doc. 224-3 at 9.) "May and Winemiller underwent U.S. Coast Guard breathalyzer tests approximately five hours after the incident. May had a 0.138% blood alcohol concentration ("BAC") and Winemiller had a 0.027% BAC. (Doc. 228 at 10, # 61, Pretrial Order, Established Facts.) More specifically, as it pertains to May, May's blood alcohol was measured at .138 by breathalyzer and .128 by serum blood test. (YRT SUMF # 12, Doc. 155-2 at 3; Doc. 187-1 at 4.)

permission or authorization? Did the trip violate YRT's skiff policies known by the crew? Despite YRT's no-alcohol policy, was the crew's consumption of alcohol consistent with a condoned practice and culture of alcohol and drug use by crew members on duty? There is conflicting evidence on each of these questions.

The Fifth Circuit has explained that "whether a given act by an employee is committed within the course and scope of his employment is highly factual. . . ." *Stoot v. D & D Catering Service, Inc*., 807 F.2d 1197, 1199 (5th Cir. 1987). The Court in *Beech* stated similarly that "[d]eterminations of scope of employment, and, thus, vicarious liability, are most accurately characterized as mixed questions of law and fact because they involve legal conclusions based upon factual analysis." *Beech*, 691 F.3d at 569 (quoting *Hussaini v. Marine Transp. Lines, Inc*., 158 F.3d 584 (5th Cir. 1998)). "Deciding where an employee's conduct falls on the course and scope of employment continuum is necessarily a fact-intensive inquiry, and courts have few bright line principles to guide them." *Id.* at 577. *See also Shields v. New Orleans Pub. Belt R. Co*., No. 13-5135, 2014 WL 1763174, at *5 (E.D. La. Apr. 30, 2014); *O'Berry*, 2017 WL 3594204, at *3.

Again, YRT argues that the four YRT employees on the skiff were not within the course and scope of their employment prior to and at the time of the incident because 1) they left the KING without permission and were using the skiff for an unauthorized and personal purpose (namely to consume alcohol) (Doc. 155-1 at 4–5, 10); 2) they refused to return to the KING after having been told to do so (*id*. at 10–11); 3) their actions violated known YRT company policies (*id*. at 11); 4) their actions violated Coast Guard regulations (*id*.); and 5) their reasons for going to the bar were purely personal (*id*. at 11–13). The fact that they were returning to the KING at the time of the event does not, argues YRT, bring them back into the course and scope of their employment. (*Id*. at 13–14, citing *Park v. Alakanuk Native Corp.,* No. A90-305 CIV(JAV). 1994 WL 780707 (D. Alaska Mar. 16, 1994).)

16

The Standridge Claimants argue generally that each of the so-called undisputed facts are actually "riddled with genuine issues of material fact." (Doc. 187 at 4.) For instance, there are questions of fact as to whether the policies were violated at all. (*Id*. at 6–8.), Furthermore, these Claimants maintain that the so-called "known" skiff policy the crew is supposed to have violated was not known and, to the extent it was not followed, it was because of YRT's failure to properly train its employees and enforce its policies. (*Id*. at 4–6; *see also id*. at 8–11.) Indeed, YRT's "vessel-wide practice . . . [was] **contrary** to its policy." (*Id*. at 6). Finally, there is evidence to support the conclusion that "the skiff crew's trip to Jack Miller's Landing was 'in the service of the ship' or 'in furtherance of [YRT's] business interests,' " for three reasons: first, seaman relaxing on shore promotes the employer's business interests and is a necessary part the sailing of vessels. (*Id*. at 11–26, citing, among other cases, *Aguilar*, 318 U.S. at 732–34.) Second, the fact that the crew members were admittedly intoxicated does not change this rule. (*Id*. at 12.) Third, even while at Jack Miller's Landing, the crew "was still answerable to Captain Billy Evans' orders." (*Id*. at 13.)

CJM makes many of the same arguments as the Standridge Claimants but emphasizes the fact that Captain Billy Evans was indisputably within the course and scope of his employment and also negligent. (Doc. 189 at 14–21.)

### 1. Was the Crew's Trip to Jack Miller's Bar and/or the Use of the Skiff "Unauthorized" and/or in Violation of Known Policies?

The Fifth Circuit in *Beech v. Hercules Drilling Company, LLC*, as YRT correctly notes, states that an employee's violation of a safety policy is relevant to the course and scope issue "because it gives guidance regarding what employee conduct furthers [the employer's] business interests." (Doc. 155-1 at 11, quoting *Beech*, 691 F.3d at 576.) But *Beech* was careful to explain that, while "safety policy violation[s]" are relevant, they are "not dispositive of the course and scope issue." *Beech*, 691 F.3d at 576. "It may be true that not every violation of [a] safety policy automatically casts an

employee outside the course of his employment." *Id*. (citing *Frederick v. Swift Transp. Co*., 616 F.3d 1074, 1079–80 (10th Cir. 2010). The reasoning behind this qualification is sound since, in many cases, a seaman's conduct injuring a third party may involve both negligence and the violation of his employer's own policies; to remove a seaman from the course and scope of his employment merely for violating an employer's safety policies would immunize the employer from liability in such cases.

YRT charges that the four crew members left the KING in the skiff "without authority" and "without permission," (Doc. 155-1 at 1; Doc. 155-2 at 1, #s 1–3) and "[t]heir actions were directly contrary to *YRT's explicit policies, of which they were all expressly aware*" (Doc. 155-1 at 11, emphasis added, record citations omitted).  There is no doubt that Captain Standridge gave his permission to leave in the skiff. There is conflicting record evidence as to whether Standridge was the captain in charge of the KING with the authority to do so.

Specifically, there is conflicting evidence as to who was in charge of the KING at the time Standridge and the three other crewmembers left the KING in the skiff and therefore who had authority to authorize the use of the skiff.[12] Some witnesses testified Standridge was the acting Captain (Doc. 175-10, Lashbrook Dep., at 110). Other evidence suggests that Evans was the "Master or Person-in-Charge." (*See, e.g*., Doc. 175-8 at 1, USCG 2692 submitted by YRT.) Others testified that Standridge and Evans were both acting captains (Doc. 175-12, Winemiller Dep., at 268–69; 282, 221–22; Doc. 175-16, May Dep., at 158-159) so that Standridge had the ability to—and did— authorize the trip. (Doc. 175-12, Winemiller Dep., at 26, 30, 65–66 and 655). According to expert witness Captain J.P. Jamison, this failure to properly train the crew in the proper chain of command resulted in the crew believing Standridge was Captain and had power to authorize taking the skiff. (Doc. 175-33, Captain Jamison Dep., at 125–27.)

---

[12] The record in this case is voluminous. The Court will not undertake to recite all the conflicting evidence on each point since summary judgment must be denied if there is conflicting evidence demonstrating a genuine dispute as to any material fact. Federal Rule of Civil Procedure 56(a).

YRT admits that Standridge was the Captain and Evans was the pilot (Doc. 224-3 at 3, # 16)[13]

but argues, "[r]egardless, the crew was *trained and aware* that personal use of the skiff—such as

what they were doing on the night of the accident—*required approval of the YRT office*" (*id*., record

citations in footnote 12 and 15 omitted, emphasis added.) However, this point is hotly contested, the

Standridge Claimants directing the Court to the deposition of Jason Bailess, safety Manager at YRT

who agreed that "[t]here is nothing in this policy or procedure for skiff use at [YRT] about the

mandatory requirement to call ShoreSide for approval to use a skiff . . ." (Doc. 175-5, Bailess Dep., at

124.) Bailess admitted that the rule requiring prior shoreside approval was not made until after the

accident. (*Id*. at 157, 163–64; 214–15; *see also*, Doc. 187-1 at 11, # 14 and Doc. 224-3 at 4, # 14.)[14]

YRT argues that its policies prohibited the crew from using the skiff for personal reasons.

(*See, e.g,*. Doc. 155-2 at 1, # 2.) The Standridge Claimants admit this was the written policy but

counters that YRT failed to properly train and advise its crew of the policy and, despite YRT's

statement that the crew was "trained and aware" of the policies, May and Winemiller testified that

they believed that the trip to Jack Miller's was authorized. (Doc. 187-1 at 2, # 2, citing Doc. 175-16 at

275–76; 153–58; Doc. 175-12, Winemiller Dep., at 26, 30, 65–66, 655.) Furthermore, the KING's

mate (May) and chief engineer (Lashbrook) testified that, with the captain's approval alone, they

believed that the use of the skiff to get groceries and cigarettes was an "accepted", "known" and

"common" practice and did not violate YRT's skiff use policy. (Doc. 175-16, May Dep., at 64–65,

139, 242–45; Doc. 175-10, Lashbrook Dep., at 44–46, 47–48.) On at least two other occasions, they

had used the skiff to buy liquor. (Doc.175-10, Lashbrook Dep., at 44–46.) Earlier in the afternoon of

the casualty, "May and Lashbrook took the KING's skiff to Jack Miller's . . ." where they "each

---

[13]  *See also* Doc. 224-3 at 2 where YRT states that "the crew of the . . . KING testified that Captain Standridge was the senior person on board and the person whose orders they were required to follow." The Standridge Claimants contend the opposite. (Doc. 187-1 at 8, # 2, record citations omitted.)

[14] While YRT objects to this testimony as an inadmissible subsequent remedial measure under Federal Rule of Evidence 407 (Doc. 224-3 at 4, # 14, citation omitted), the Court is using this evidence not to suggest negligence or culpable conduct, but for "another purpose," namely, as evidence of the absence of a written rule at the time of the accident.

purchased and consumed alcohol at Jack Miller's . . . and brought alcohol back to the [KING] . . . [and] proceeded to drink the alcohol they brought back to the vessel . . ." (Doc. 228 at 8, # 35– #37, Pretrial Order, Established Facts.)

Furthermore, even if the trip to Jack Miller's was unauthorized or in violation of company policy, the Fifth Circuit has made clear that whether a seaman is in the course and scope of his employer must be measured as of the time of the injury, *i.e.*, as they were returning to the KING. *Beech*, 691 F.3d at 574 ("[T]he test for whether a Jones Act was acting within the course and scope of his employment is whether his actions *at the time of the injury* were in furtherance of his employer's business interests." (emphasis added). While Standridge and the three others remained at Jack Miller's bar drinking for some period of time after they were initially called back to the KING (Doc. 155-2 at 3, SUMF # 10), and only left "when the bartender felt they had 'enough to drink' and 'kicked them out,'" (*id.*, SUMF*,* # 11; Doc. 187-1 at 4, #11; Doc. 189-1 at 2, # 11), there is also evidence that they were returning, at least in part, in response to Evans' order to do so. (Doc. 175-4, YRT Corp. Dep., at 249.)

 In addition, the return trip to the KING involved at least one other arguably non-personal, business-related purpose: Captain Evans asked May to bring him crawfish from Jack Miller's. (Doc. 175-16 at 178.) Furthermore, May testified that while at Jack Miller's, they were subject to and obligated to follow Captain Evans' (as well as Standridge's) orders. (Doc. 175-16, May Dep., at 158–59). As admitted by YRT, Winemiller was on watch at the time he left the KING, and May was considered "on call" at the time; Standridge's and Jackson's next watch was scheduled to begin at 11:30. (Doc. 155-2 at 4, # 15 and # 16.) Thus, there is evidence not only that they were "answerable" to the call of duty but were *answering* the call of duty.

YRT argues that the fact they were returning to the KING at the time of the injury is of no moment, citing *Park v. Alakanuk Native Corp.*  There are several reasons *Park* is not persuasive.

First, this decision was rendered after a trial on the merits. *Park*, 1994 WL 780707, at *1. The present issue is before the Court on a summary judgment motion. Second, and most importantly, unlike the situation in *Park*, there is evidence here that the crew of the skiff was returning to the KING at the specific direction of Captain Evans and was bringing Evans, at his request, food from Jack Miller's. *See Magnolia Towing Co. v. Pace*, 378 F.2d 12 (5th Cir.1967) (affirming verdict for a salaried seaman injured while traveling to his vessel as per his superior's orders in an automobile owned by his employer and driven by an on-duty coworker).

Third, the court in *Park* relied in part upon the reasoning and holding in *Aguilar*, to find that the plaintiff was not in the course and scope of his employment at the time of the alcohol related auto accident and denied recovery based on its conclusion that the auto accident was caused by the intoxication. *Park*, 1994 WL 780707, at * 6. As stated above, the Court finds that *Beech* and not *Aguilar* provides the test the Court must rely on to determine course and scope in this case.

But even if *Aguilar* set the proper standard here, in traditional seamen cases, a seaman's intoxication while on authorized shore leave will not take him outside the course and scope of employment unless the intoxication was a cause of the accident. *Ebanks*, 2013 WL 2243839, at **5–6. In this case, the evidence is unclear whether May's intoxication and that of the others was a cause of the accident. The Standridge Claimants argue that "there is no evidence whatsoever—and certainly none cited in [YRT's] motion—that the crew's intoxication contributed to the incident in any way, shape or form." (Doc. 187 at 14.) YRT responds that there is evidence that intoxication played a role since the skiff carrying the four intoxicated men "ran directly into two barges" and they "did not see or hear the barges until they were 15 feet away, despite testimony and video evidence that the barges were lit." (Doc. 224 at 8, not citing to record evidence.)

But there is a factual dispute as to whether the skiff even hit the barges being pushed by the FITCH. (*See* Doc. 189 at 3 where CJM describes the "incident" as one "in which [the skiff] either

21

swamped or struck an object in the water;" *see also*, Doc. 148-2 at 5.) Indeed, in support of its own motion for summary judgment, CJM contends "[n]o evidence or witness testimony in the record conclusively shows that CJM's vessel . . . was actually struck by the skiff." (Doc. 148-2 at 2; *see also id*. at 8: "[T]here is no evidence or testimony that confirms the FITCH was even involved in a collision with the skiff.").

Furthermore, YRT fails to support its assertion with anything other than its conclusory statement. For instance, it points the Court to no expert or other record testimony or evidence as to how and where the barges were lit and at what distance the barges could have been seen and heard under the circumstances then existing. Part of the Standridge Claimants' complaint against YRT is that the skiff was not carrying navigational lights which may have made it easier for the occupants of the skiff to see the barges and to be seen by those pushing the barges. (*See, e.g*., Doc. 187 at 19–20.) The relative strength of these arguments are issues of fact which cannot be decided on summary judgment.

Finally, unlike the facts in *Park*, there is a substantial body of evidence that there was a condoned practice and culture of drinking alcohol and using drugs by the crew and captains of the KING while they were on duty, both on the vessel and off. This is taken up in greater detail in the next section.

In conclusion, after reviewing the voluminous record in this matter, the Court finds that there is conflicting evidence and questions of material fact regarding a) whether the trip to Jack Miller's in the skiff was made with—or without—the permission of one with authority to give permission; b) whether it was made in violation (or not) of known policies regarding the use of the skiff; and c) whether or not, at the time of the accident as they were returning to the KING, they were subject to the authority of Captain Evans and returning under his direct orders. These questions preclude the granting of summary judgment on the issue of course and scope.

      **2.** *Was the Crew's Alcohol Consumption a Violation of Company Policy or Consistent with a Condoned Practice and Culture of Alcohol and Drug Use While Working?*

As mentioned earlier in this ruling, there is no doubt that YRT had a policy prohibiting YRT employees from possessing or drinking alcohol while on board any vessel or vehicle while being paid by YRT. (Doc. 155-2 at 1, #1 (record citations omitted); Doc. 187-1 at 1, # 1; Doc. 189-1 at 1, # 1) It is also undisputed that all four employees had consumed significant amounts of alcohol at the time of the accident.[15]

But both the Standridge Claimants and CJM point the Court to abundant evidence suggesting that the actual practice aboard the KING was far different than its stated policy and, in fact, shows a widespread, well-known, condoned, and "pervasive drinking culture" aboard the KING. (Doc. 187-1 at 1, # 1; *see also* Doc. 189-1 at 1, # 1.) Winemiller testified that alcohol was not only consumed on board but actually made on the KING by May and Winemiller and was stored in May's cabin (Doc. 175-12 at 107), the vessel's refrigerator (*id*. at 116), and the engine room (*id*. at 115.)  The KING's mate, May and another captain (Tim Chism)[16] were aware that Winemiller was a "heavy drinker." (*Id*. at 109–110.) Lashbrook, the engineer, was an alcoholic (*id*. at 117) who also consumed the homemade wine made on the KING (*id*. at 115) and "always had liquor every hitch with him" (*id*. at 111).

Two of the captains (Standridge and Chism) and other crew members would leave the boat, purchase alcohol and bring it back to the KING (*id*. at 111, 113). As mentioned above, earlier in the

---

[15] After leaving the KING and arriving at Jack Miller's bar, the crew drank alcohol (Doc. 155-2 at 2, YRT SUMF # 9), and "remained at the bar until 7:51 p.m., video time, when the bartender felt they had 'enough to drink' and 'kicked them out.'" (*Id*. at 3, YRT SUMF # 11.) May was driving the skiff on the night of the incident. (SCASF #34, Doc. 187-1 at 15; Doc. 224-3 at 9, #34.) Following the casualty, May's blood alcohol was measured at .138 by breathalyzer and .128 by serum blood test. (Doc. 155-2 at 3, YRT SUMF # 12; Doc. 187-1 at 4, # 12.)

[16] The Court notes that Chism's name is spelled differently in various parts of the record. (*Compare, e.g*., Doc. 175-12 at 109-110, where his name is spelled "Chism"), *with* Doc. 189 at 11, where it is spelled Chisolm.) For sake of clarity and consistency, the Court will use "Chism".

afternoon of the casualty, "May and Lashbrook took the KING's skiff to Jack Miller's. . ." where they "each purchased and consumed alcohol at Jack Miller's . . . and brought alcohol back to the [KING] . . . [and] proceeded to drink the alcohol they brought back to the vessel . . ." (Doc. 228 at 8, # 35– #37, Pretrial Order, Established Facts.)

YRT's corporate representative testified that YRT relies on its captains to enforce its drug and alcohol policy and yet two of them were regularly abusing it. (Doc. 175-4 at 220.) According to Winemiller, Standridge too was an alcoholic to whom Winemiller personally served homemade wine (made on the KING) while Standridge was at the wheel of the KING and the vessel was underway. (Doc. 175-12, Winemiller Dep., at 456–)

Indeed, both Captains Chism and Standridge along with May drank alcohol in the wheelhouse while the vessel was underway (Doc. 175-12, Winemiller Dep., at 118; Doc. 175-10, Lashbrook Dep., at 184–86) and May drank it periodically during the day (Doc. 175-12, Winemiller Dep., at 118). The trip to Jack Miller's was not the first time a YRT captain and crew left the KING to go to a bar and drink and then return to the boat. (*Id.* at 111.) As mentioned above, May and Lashbrook did so earlier that afternoon. (Doc. 228 at 8, # 35–#37, Pretrial Order, Established Facts.)

Marijuana was also smoked on board the KING by Chism, May and Lashbrook. (Doc. 175-10, Lashbrook Dep., at 52; 184–86.) Cocaine was also used. (Doc. 175-12, Winemiller Dep., at 449–53, 456; Doc. 175-10, Lashbrook Dep., at 170.) The week before the accident in question, Captains Standridge and Chism along with Winemiller and May left the KING while it was in Corpus Christi to go to a strip club (Doc. 175-12, Winemiller Dep., at 111–12; *see also* Doc. 175-10, Lashbrook Dep., at 50–51) and used cocaine while they were there. (Doc. 175-12, Winemiller Dep., at 449, 456; Doc. 175-10, Lashbrook Dep., at 170.) There were other times crew members left the KING to drink alcohol and then return. (*Id.*)

YRT's safety manager Jason Bailess was aware of two other instances in which alcohol had

been used aboard other YRT vessels. (Doc. 175-5 at 323–24.) Yet, YRT failed to perform random drug and alcohol testing on its employees. (Doc. 175-4, YRT Corp. Dep., at 220–21; Doc. 175-12, Winemiller Dep., at 644.) That neither May nor Winemiller were disciplined or fired as a result of the incident in which both had been drinking and two men were killed is further evidence that YRT's alcohol policy was not enforced. (Doc. 189-5, May Dep., at 193–94; Doc. 189-6, Winemiller Dep., at 609.) Indeed, on an October 20, 2020 response to an employment inquiry from a third-party company, YRT did not note any "disciplinary problems" with Winemiller and reported he resigned (*i.e.*, was not fired) from the company. (Doc. 189-7 at 3.)

In *Beech*, the Fifth Circuit made clear that the ingestion of an intoxicant in violation of a company's policy does not, by itself, remove a worker from the course and scope of his employment. 691 F.3d at 576 (citing with favor *Frederick*, 616 F.3d at 1079–80) (holding that a worker who had violated employer's policies by using methamphetamine while driving employer's truck on assigned route was within the course and scope of her employment.) The violation of such a policy is, as the Court in *Beech* sated, "relevant" but "not dispositive." *Id.* at 576.

On this issue, the Court finds *Diamond Offshore Management Co. v. Guidry*, 171 S.W.3d 840 (Tex. 2005), persuasive. There, the Texas Supreme Court reversed a jury verdict in favor of an intoxicated seaman who was killed in an automobile accident while allegedly returning to his drilling vessel after a two-hour drinking stint at a karaoke bar, finding that the jury had not been properly charged on the issue of course and scope of employment. The decedent's employer argued that because the decedent worked on the drilling rig for two to three hitches, he was not entitled to take advantage of the *Aguilar v. Standard Oil* line of cases. *Diamond Offshore*, 171 S.W.3d at 842–43 (relying on *Sellers*, 433 F.2d at 448). The Court responded that, "[a]ssuming *Sellers* is correct, Guidry's two-hour venture from his rig mid-hitch is not so far removed from his work there as to be, as a matter of law, outside the scope of his employment." *Id*. at 843.

In remanding the case for trial with proper instructions and jury interrogatories to be given to the jury on the issue of course and scope, the court stated,

> While there was thus some evidence that Guidry was in the course of his employment, that evidence was not conclusive. The jury was free to disbelieve the plaintiff's expert. Auth also testified that employees did not further Diamond's interests when they were off-duty and that going to a bar would not be business-related. McWilliams' credibility was in question because Diamond had terminated his employment under circumstances he believed were not justified. Further, a seaman's misconduct while on shore leave, such as intoxication, may take him outside the course of employment. Thus, the issue whether Guidry was in the course of his employment at the time of the accident was one for the jury.

*Id.*

Also relevant here is the evidence reviewed above of an alleged culture and practice aboard the KING which allegedly permitted widespread and regular alcohol and drug use. In this regard, the Court finds the case of *Garay v. Carnival Cruise Line, Inc*., 904 F.2d 1527 (11th Cir. 1990), to be instructive. *Garay* involved, in part, a claim by a seaman for maintenance and cure for injuries suffered in a fall on his ship after returning to the vessel following a bout of drinking on shore. The jury found that the plaintiff's claim for maintenance and cure should be denied because of his willful misconduct. *Garay*, 904 F.2d at 1529. In reversing the district court's decision to deny plaintiff's motion for directed verdict on this issue, the Eleventh Circuit stated:

> The ship policy concerning the consumption of alcohol and the sobriety of seamen is relevant in considering whether or not Garay was willfully misbehaving by being intoxicated on board. Where the shipowner condones drunkenness aboard his vessel, we cannot say that a seaman who is drunk is willfully misbehaving, such that we could term the conduct "positively vicious . . . , such as gross negligence or willful disobedience of orders."

*Id.* at 1531–32.

The court went on to say,

> Where the crew is permitted to drink, even to the point of drunkenness, and the ship's captain and officers are aware that crew members have

been, are, and will be drunk on board, and the ship does not prohibit such behavior on the part of the crew, we cannot say that a seaman who indulges in intoxicating liquors is engaging in "willful misconduct" that is "positively vicious" or the deliberate disobedience of orders.

***

Carnival cannot look on a seaman's drunkenness as a tolerable and acceptable condition, tacitly encouraged by the rarity of any imposition of discipline, and operation of the crew bar, and at the same time ask us to view Garay's alleged intoxication as willful misconduct.

As a matter of law, therefore, we hold that the defense of willful misconduct is not available to Carnival because drunkenness on the part of seamen was not "misconduct" on board the Tropicale.

*Id. See also Schillage v. Tidewater Crewing Ltd.*, No. 93-2710, 1995 WL 72768, at *3 (E.D. La. Feb. 16, 1995) (denying vessel owner's motion for summary judgment on Jones Act negligence claim based on evidence that employer "allowed and encouraged the alcohol use that allegedly played a part in his accident.").

The Court finds that the same rationale applies here on the issue of course and scope and concludes, under the circumstances described above, that there are questions of material fact as to whether Standridge and the other crew members on the skiff, despite their admitted drinking, were within the course and scope of their employment at the time of the accident.

### 3. Is Dismissal Appropriate if Occupants of the Skiff Were Not in the Course and Scope of their Employment?

In its October 19, 2022, oral announcement of its ruling on YRT's Motion, the Court stated that, even if Standridge, May, Jackson and Winemiller were not in the course and scope of their employment with YRT, "it would not necessarily eliminate their claim under the general maritime law for negligence." (Doc. 271 at 2.) Because the parties had not previously addressed this issue, YRT requested permission to brief it, which request the Court granted, ruling that "the Court will hold in abeyance" its ruling on this issue until it considered the briefs. (*Id.*) YRT filed a brief on the

issue (Doc. 283), but the Standridge Claimants failed to do so.

After reviewing the briefing, the Court finds that YRT is correct and that if Standridge was not in the course and scope of his employment with YRT, his survivors have no general maritime law claim for negligence against Standridge's employer YRT. Prior to the enactment of the Jones Act, a seaman could not recover against his employer for negligence. *Beech*, 691 F.3d at 570 (citing *The Osceola*, 189 U.S. 158 (1903)). Thus, an action for negligence against a seaman's employer may only be brought under the Jones Act. *McDermott Int'l v. Wilander*, 498 U.S. 337, 342 (1991). However, the Court, as detailed above, finds that there are multiple fact issues regarding whether Standridge and the other occupants of the skiff were in the course and scope of their employment at the time of the accident.

### C. Superseding Cause

The Fifth Circuit articulated the standard for applying the doctrine of superseding cause in a maritime case as follows:

> The court [in *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455 (5th Cir.) (en banc), *cert. denied*, 469 U.S. 832 (1984),] set out the factors to be examined to determine whether an intervening force supersedes prior negligence. *Id*. at 464, quoting RESTATEMENT (SECOND) OF TORTS § 442.11. The court emphasized that:
>
>> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>>
>> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
>>
>> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
>>
>> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in

which it is done is not extraordinarily negligent.

> *Nunley*, 727 F.2d at 464–65, quoting RESTATEMENT (SECOND) OF
> TORTS § 447.

*Donaghey v. Ocean Drilling & Expl. Co*., 974 F.2d 646, 652 (5th Cir. 1992)

The Fifth Circuit has also counseled that "[d]etermination of the issue of superseding cause ordinarily presents factual questions to be answered by the trier of fact, and not disposed of as a matter of law." *Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1192 (5th Cir. 1978) (applying Restatement (Second) of Torts § 447). *See also Lenoir v. C. O. Porter Mach. Co*., 672 F.2d 1240, 1245 (5th Cir. 1982) (issue of intervening cause "presents a factual question to be answered by the trier of fact.").

Here, as discussed in preceding sections, there are questions of fact regarding whether the trip to Jack Miller's was authorized by someone in a position to grant permission; whether the skiff policy was "known" and enforced; and whether the trip to Jack Miller's and the crew's alcohol consumption was consistent with an established and condoned practice and culture at YRT.  Putting these issues into the superseding cause framework established by the Fifth Circuit and Restatement, there are material issues of fact regarding a) whether YRT "should have realized" that the occupants of the skiff "might so act;" b) whether "a reasonable man knowing the situation existing when the act of the [skiff occupants] was done would not regard it as highly extraordinary that the [skiff occupants] had so acted;" and c) whether the conduct of the skiff occupants was "a normal consequence of a situation created by the [YRT's] conduct and the manner in which it is done [was] not extraordinarily negligent." These are matters for trial. Accordingly, YRT's Motion on this ground is denied.

## V.    CONCLUSION

For the foregoing reasons, YRT's *Motion for Summary Judgment Seeking Dismissal of Claims Against Yazoo River Towing, Inc.* (Doc. 155) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>November 10, 2022</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**