# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF YAZOO RIVER TOWING, INC., AS OWNER AND OPERATOR OF THE TWO BOAT MELVINL. KING, AND ITS ENGINES, MACHINERY, GEAR, TACKLE, APPAREL AND ITS SKIFF AND ALL OTHER APPURENANCES, PETITIONING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | CIVIL ACTION NO. 20-214-JWD-SDJ c/w 20-252-JWD-SDJ JUDGE JOHN W. deGRAVELLES MAGISTRATE JUDGE SCOTT D. JOHNSON |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   INTRODUCTION AND PROCEDURAL HISTORY

1.      On February 10, 2020, the skiff of the M/V MELVIN L. KING (the "KING") sank in the Port Allen Route between the Bayou Sorrel and the Port Allen Locks as four crew members of the KING traveled in the skiff from a bar to the KING.[1] During this tragic incident, Lloyd "Ray" Standridge ("Standridge") and another crew member, Norsalus Jackson ("Jackson"), drowned.[2]

2.      The KING is an inland towboat owned and operated by Yazoo River Towing, Inc. ("YRT").[3] The surviving members of Standridge's family ("Standridge Claimants" or "Claimants") allege that the skiff sank when it was struck by barges being pushed by the inland push tug M/V CECILE A. FITCH ("CECILE").[4]

---

[1]      Doc. 320, Pretrial Order, at 3–7, Established Facts 1, 21, 45–48. Unless indicated otherwise, all references to docket numbers are in Case No. 3:20-cv-214.

[2]      *Id*. at 6, Established Fact 49.

[3]      *Id*. at 4, Established Fact 20.

[4]      *Id*. at 1.

3.      The CECILE is owned by Limitation Complainant, Chester J. Marine, LLC ("CJM").[5]

4.      YRT not only owned the KING and its skiff[6] but also employed the KING's six-person crew, which consisted of: Captain Billy Evans ("Evans"), Captain (or Pilot) [7] Standridge, engineer Shannon Lashbrook ("Lashbrook"), mate Jamie May ("May"), and deckhands Jackson and Austin Winemiller ("Winemiller").[8]

5.      The facts and circumstances leading up to and surrounding this tragedy, and who is to blame, are hotly contested issues.

6.       Claimants filed suit against CJM, YRT, and LeBeouf Bros. Towing, LLC in the 18th Judicial District Court for the Parish of Iberville, State of Louisiana—in the matter entitled *Charlotte Standridge, individually and as personal representative for the Estate of Lloyd Standridge, Ashley Standridge and Aaron Standridge v. Yazoo River Towing, Inc., Chester J Marine, LLC and LeBeouf Bros. Towing, LLC*, Proceeding No. 79717-A.

7.      Thereafter, on April 8, 2020 and April 29, 2020, CJM and YRT respectively initiated separate limitation proceedings before this Court.[9] On July 17, 2020, the cases were

---

[5]      *Id.* at 3, Established Fact 2.

[6]      Doc. 351, Trial Transcript, Vol. 1, at 149, 171 (YRT's corporate representative Patrick Smith). *See also* Doc. 320, Pretrial Order, at 4, Established Facts 20–21.

[7]      At trial, the parties disputed the hierarchy of the crew aboard the KING and whether Evans or Standridge was the vessel's captain. Claimants argue that Evans was the captain and Standridge was the pilot. (*See, e.g.*, Doc. 360, Claimant's Proposed Findings of Fact and Conclusions of Law (hereafter "CPFFCOL"), at 7, ¶ 14.) CJM argues that they were both Captains. (*See, e.g.*, Doc. 367, CJM's Proposed Findings of Fact and Conclusions of Law (hereafter "CJM's PFFCOL"), at 6, ¶ 2.) The Court finds that it need not resolve this factual dispute since, in either event, the Court's ruling is the same.

[8]      Doc. 320, Pretrial Order, at 5, Established Facts 26, 27.

[9]      *See generally* Case No. 3:20-cv-214, Doc. 1, CJM's complaint for exoneration from or limitation of liability; Case No. 3:20-cv-252, Doc. 1, YRT's verified complaint.

consolidated.[10] Claimants, Charlotte Standridge, individually and as the personal representative for the Estate of Lloyd Standridge, Ashley Standridge, and Aaron Standridge, asserted claims in both CJM's and YRT's limitation actions.[11] So did Catina McCloud-Smith, suing for the wrongful death decedent Jackson,[12]—who was later substituted by Shayla Wright.[13]

8.    On June 29, 2021, the Court bifurcated the issues to be tried to the bench in the limitation trial.[14] Specifically, the Court held that "[t]he issue of liability, limitation and apportionment of fault will be tried to this Court in connection with the limitation proceeding."[15]

9.    The case was tried to the bench January 9, 2023, through January 12, 2023.[16]

## II.  PARTIES TO THE LIMITATION TRIAL

### A.  Limitation Petitioner

10.    CJM is the only remaining limitation petitioner in this case.

11.    CJM is a limited liability company established under the laws of the State of Louisiana.[17]

12.    CJM is the owner and operator of the CECILE.

---

[10]    Case No. 3:20-cv-214, Doc. 21, minute entry containing the Court's order consolidating cases.

[11]    Case No. 3:20-cv-214, Doc. 13, the Standridge Claimants' claims in CJM's limitation case; Case No. 3:20-cv-252, Doc. 13, the Standridge Claimants' claims in Yazoo's limitation case.

[12]    Case No. 20-cv-214, Doc. 12, Ms. McCloud-Smith's claims in CJM's limitation case; Case No. 3:20-cv-252, Doc. 11, Ms. McCloud-Smith's claims in YRT's limitation case.

[13]    Case No. 3:20-cv-214, Doc. 49, minute entry substituting Catina McCloud-Smith with Shayla Wright in both limitation actions.

[14]    *Id.*, Doc. 101, minute entry reflecting the Court's bifurcation ruling.

[15]    *Id.*

[16]    Docs. 351–54, Trial Transcripts, Vols. 1–4.

[17]    Doc. 1, at 1, ¶ 1.

13.     The sole owner of CJM is Captain Larry Fitch.[18]

**B.  Limitation Claimants**

14.     The Standridge Claimants are the only remaining limitation claimants in this action.

**C.  Non-Parties to Limitation Trial**

15.     On September 6, 2022, the limitation claimant Shayla Wright, as personal representative of decedent Jackson, notified the Court that she settled all of her claims against CJM and YRT.[19] On December 12, 2022, the Standridge Claimants notified the Court that they settled all of their claims against YRT.[20] In light of these settlements, the only remaining parties in this limitation trial are the Standridge Claimants and CJM.

16.     The Court must determine whether CJM is at fault in causing the accident and, if so, whether it is entitled to limit its liability. If at fault, the Court must apportion fault among the various parties and non-parties who may have been involved in causing this accident including CJM, Standridge, and YRT (independently or vicariously through its employees Evans and May).

**D.  General Facts Leading Up to the Accident**

17.     As stated above, this matter involves the loss of two lives in a maritime accident, which occurred on February 10, 2020, on the Gulf Intracoastal Waterway Morgan City—Port Allen Route between the Bayou Sorrel locks and the Port Allen locks. While the exact location is unknown,[21] it is stipulated that the incident "occurred somewhere between the KING's location

---

[18]     Doc. 351, Trial Transcript, Vol. 1, at 12–13 (Captain Fitch).

[19]     Doc. 230, the Jackson claimants' Notice of Settlement. *See also* Doc. 231, minute entry reflecting the Court's conditional dismissal in light of the settlement.

[20]     Doc. 317, the Standridge Claimants' Notice of Settlement.

[21]     Doc. 320, Pretrial Order, at 6, Established Fact 51.

and Jack Miller's" Landing, a convenience store and bar "located about 1.6 miles north of where the KING was tied off . . . ."[22]

18.    At the time of the accident, the KING was pushed up against the right-descending bank of the Port Allen Route at approximately Mile Marker 41.4, facing southbound.[23] As stated above, the KING was manned by a crew of six: Captains Standridge and Evans, mate May, engineer Lashbrook, and deckhands Winemiller and Jackson. Captains Standridge and Evans were both U.S. Coast Guard-licensed captains. May was a licensed tankerman.

19.    The KING was equipped with an auxiliary vessel, referred to as a "skiff." The skiff was an appurtenance of the KING.[24] The skiff was "a small, flat-hulled open boat with an outboard kill-switch motor[,]"[25] which had a 500-pound weight limit for passengers.[26]

20.    It is undisputed that at approximately 5:35 p.m. or 5:40 p.m., Standridge, May, Winemiller, and Jackson took the skiff and travelled to Jack Miller's Landing, a grocery store and bar.[27]

21.    Both sides agree that Standridge, Jackson, May, and Winemiller spent slightly more than two hours drinking at Jack Miller's Landing.[28] Both sides agree that at some point after 8:20 p.m. when they left the bar, the KING's skiff, with May at the controls, began its return voyage to

---

[22]    Doc. 320, Pretrial Order, at 5, Established Fact 30. *See also id*., Established Fact 29.

[23]    *Id*. at 4, Established Fact 19.

[24]    Doc. 351, Trial Transcript, Vol. 1, at 171, Testimony of Patrick Smith.

[25]    Doc. 320, Pretrial Order, at 4, Established Fact 21.

[26]    *Id*., Established Fact 24.

[27]    Doc. 360, CPFFCOL, at 7, ¶ 15; Doc. 367, CJM's PFFCOL, at 8, ¶ 13.

[28]    Doc. 320, Pretrial Order, at 6, Established Fact 42.

the KING traveling south and that the occupants of the skiff, including Standridge and May, were drunk.[29]

22.    Both sides agree that at this time, the CECILE was headed north in the direction of Jack Miller's Landing and that its captain, Larry Fitch, was at the helm.[30]

23.    Both sides agree that, before reaching the KING, the skiff sank, and Standridge and Jackson drowned.[31] The parties agree that, again, while "[t]he exact location of the incident . . . is unknown . . ., it is established that it occurred somewhere between the KING's location and Jack Miller's."[32]

24.    The parties disagree, however, as to whether the CECILE collided with the skiff and, even if it did, whether the CECILE was at fault.

## E.  Allegations of the Parties

25.    The Standridge Claimants allege that, as the CECILE was proceeding north on the Port Allen Route between the Bayou Sorrel Locks and the Port Allen Locks, its tow struck the skiff, which was heading south.[33] According to Claimants, the occupants were thrown into the water resulting in the deaths of Standridge and Jackson. Originally, Claimants alleged that the

---

[29]    *See, e.g.*, Doc. 320, Pretrial Order, at 6–7, Established Facts 42, 58, 59. *See also* Doc. 360, CPFFCOL, at 8, ¶ 14 ("It is undisputed that the skiff crew got intoxicated while at Jack Miller's landing."); Doc. 367, CJM's PFFCOL at 8–9, ¶¶ 14–17; 15–17, ¶¶ 37–41.

[30]    Doc. 320, Pretrial Order, at 3–4, Established Facts 5, 8, 10, 16, 17.

[31]    *Id.* at 6, Established Facts 48–49.

[32]    *Id.*, Established Fact 51.

[33]    Doc. 360, CPFFCOL, at 11, ¶ 24.

negligence of CJM and YRT caused Standridge's death.[34] Following their settlement with YRT, Claimants contend that CJM is solely at fault.[35]

26.    Claimants argue that CJM and its owner Captain Larry Fitch were negligent because Fitch failed to see and avoid the skiff when, had he been acting with due care, he could and should have been able to do so. Specifically, Claimants argue that Fitch was negligent in a) being responsible for too many tasks simultaneously causing him to be overworked, fatigued, distracted, and inattentive;[36] b) failing to post an additional lookout at the head of the tow or elsewhere;[37] and c) failing to have the requisite number of radar devices and/or failing to properly calibrate and/or monitor the radar that was on board the CECILE.[38]

27.    CJM, on the other hand, submits that it should be completely exonerated from fault.[39] CJM does not concede that the CECILE collided the KING's skiff,[40] but, even if it did, it argues it was not negligent in doing so because the CECILE's captain (and owner) Fitch piloted the vessel with due care and could not reasonably have seen or avoided the unlit skiff.[41] Furthermore, whether an additional lookout should have been posted is left to the sound discretion of the captain, and in this case there was no abuse of that discretion because there was no need for

---

[34]    Case No. 3:20-cv-252, Doc. 13, the Standridge Claimants' answer and claim in the YTR Limitation.

[35]    *See generally* Doc. 360, CPFFCOL.

[36]    *Id.* at 15–8, ¶¶ 36–40.

[37]    *Id.* at 19–31, ¶¶ 46–66.

[38]    *Id.* at 32–37, ¶¶ 67–75. The Court notes that while Claimants also suggested in prior briefing that there may have been "an issue" with the CECILE's lights (Doc. 355 at 10), the Court finds that this suggestion is totally without merit.

[39]    *See generally* Doc. 367, CJM's PFFCOL.

[40]    *Id.* at 15, ¶ 32.

[41]    *See, e.g.*, *id.* at 18–21, ¶¶ 44–54.

an additional lookout.[42] As to the CECILE's radar, CJM maintains it was calibrated properly and was used reasonably and in a manner consistent with the Rules of the Road and CJM's Towing Safety Management System ("TSMS").[43] Furthermore, it argues there was no requirement or need for a second radar.[44]

28.     CJM insists that Standridge should bear the majority of fault for his role in organizing the fatal trip to Jack Miller's Landing, permitting and encouraging his subordinates to drink to the point of intoxication while on the job, breaching his duties to adhere to United States Coast Guard Inland Navigation Rules (the "Rules of the Road"), and failing to act as a prudent, licensed mariner. CJM also submits that YRT should bear all remaining liability for the conduct of its other employees that night (primarily Captain Evans and mate Jamie May) because its skiff was operating in the center of a navigable waterway, had no lights, was overloaded, all in violation of numerous Rules of the Road,[45] and finally, because the incident was the direct and predictable result of YRT's pervasive culture of allowing its employees to use drugs and alcohol while on the job.[46]

### III.    ISSUES

29.     Five main issues were raised at trial:

1) Did the CECILE collide with the KING's skiff?

---

[42]    Doc. 367, CJM's PFFCOL, at 20–21, ¶¶ 51–54.

[43]    Exhibit 39, CJM's Safety Management Manual, at 888. The Court notes that, unless otherwise indicated, references to Exhibits are meant to refer to Joint Exhibits, which were submitted jointly by both parties. A list of those exhibits is found at Doc. 313.

[44]    Doc. 367, CJM's PFFCOL, at 21–24, ¶¶ 55–63.

[45]    *Id.* at 24–27, ¶¶ 65–71.

[46]    *Id.* at 28–32, ¶¶ 78–87; *id.* at 44–46, ¶¶ 130–33.

2)  If so, was CJM at fault in causing the collision?

3)  If CJM was at fault, is it entitled to limit its liability?

4)  If CJM was at fault in causing the collision, were others also at fault in a way that proximately caused the Standridge's death including Standridge himself and YRT, either independently or vicariously through the actions of its employees May and Evans?

5)  If CJM and others were at fault, what is the appropriate apportionment of fault among the remaining parties and non-parties?

## IV.    FINDINGS OF FACT

30.    The Court makes the following Findings of Fact and Conclusions of Law. For any finding of fact that is more appropriately considered a conclusion of law, it will be deemed as such. For any conclusion of law more appropriately considered a finding of fact, it will be deemed as such.

31.    Because the Court finds that CJM was not at fault, it need not consider issues 3–5.

**A.  Did the CECILE collide with the KING's skiff?**

32.    The overwhelming evidence shows that the CECILE's tow collided with the skiff.

33.    On February 10, 2020, the CECILE was proceeding north pushing empty barges on the Port Allen Route towards Baton Rouge.[47] At about 8:27 p.m., the CECILE passed the KING heading in the direction of Jack Miller's Landing.[48] At 8:30 p.m., as he was required to do by

---

[47]    Doc. 320, Pretrial Order, at 3, Established Fact 5.

[48]    Exhibit 241, Demonstrative Timeline. *See also* Doc. 351, Trial Transcript, Vol. 1, at 211–12, 254–55 (Captain Rivera).

CJM's TSMS,[49] Fitch recorded in the CECILE's rough handwritten log that an incident occurred at 8:30 p.m.[50] The Coast Guard determined that the incident happened around 8:30 p.m.[51]

34.    The evidence at trial showed that, besides the CECILE, there were only two other vessels that transited the Port Allen Route between the location of the KING and Jack Miller's Landing during the relevant timeframe:[52] the CROCKETT and the AMERICAN FREEDOM.[53]

35.    However, the evidence also showed that neither of these two vessels could have possibly collided with the skiff. Surveillance videos obtained from Jack Miller's Landing and Verret Shipyard[54]—located about 0.1 mile south of Jack Miller's Landing[55]—show that the CROCKETT could not have struck the skiff because the skiff crew was still at Jack Miller's Landing at 7:50 p.m. when the CROCKETT passed the area at 7:47 p.m.[56] And the AMERICAN FREEDOM could not have been involved in the collision because it was trailing 40 minutes behind

---

[49]    Exhibit 39, Chester Marine's TSMS (entitled "Safety Management Manual"), section 5.1, at TBS000707. *See also* Doc. 351, Trial Transcript, Vol. 1, at 215–17 (Captain Rivera). According to the testimony of CJM's expert Captain Schropp, Coast Guard regulations require that "[t]owing vessels with a Towing SMS must be operated in accordance with the TSMS applicable to the vessel." (Doc. 354, Trial Transcript, Vol. 4, at 38).

[50]    Exhibit 31, the CECILE's rough log. *See also* Doc. 320, Pretrial Order, at 7, Established Fact 54; Doc. 351, Trial Transcript, Vol. 1, at 214–15 (Captain Rivera); *id.* at 86 (Captain Fitch). For whatever reason, the 8:30 p.m. entry in the rough log reporting an incident was not transferred to the CECILE's final digital log. Although Fitch offered different explanations as to why this was not done, the Court found these unsatisfactory.

[51]    Doc. 351, Trial Transcript, Vol. 1, at 217 (Captain Rivera)*; id.* at 81 (Captain Fitch).

[52]    *Id.* at 207–08 (Captain Rivera).

[53]    *Id. See also* Doc. 320, Pretrial Order, at 4, Established Fact 18.

[54]    Doc. 320, Pretrial Order, at 5, Established Facts 34–35.

[55]    *Id.*, Established Fact 34.

[56]    Exhibit 241, Demonstrative Timeline. *See also* Doc. 351, Trial Transcript, Vol. 1, at 207–12 (Captain Rivera); Exhibit 19, the video from Jack Miller's Landing (cam 5); Exhibit 17, the video from Verret Shipyard.

the CECILE and did not pass the KING until after 8:44 p.m.[57]—at which time the collision had already occurred (as confirmed by the fact that the crew's life jackets were found in the CECILE's tow).

36.    In addition, the skiff and its crew left Jack Miller's Landing at approximately 7:52–8:00 p.m. They boarded the skiff and proceeded south towards the KING. At the same time, the CECILE was heading north towards Jack Miller's Landing[58] and, as noted above, passed the KING around 8:27–8:35 p.m. This then put the CECILE at the time and place where this incident occurred.

37.    The Court's conclusion is also supported by damage to the skiff.[59] In addition, it is supported by the surviving witnesses to this incident: mate May and deckhand Winemiller who both testified that they were struck by a barge or saw a "black wall" coming towards them.[60] This is consistent with what they reported to the investigator when interviewed shortly after it occurred (*i.e.*, they were hit by a boat or tow).[61]

38.    Furthermore, the call log for 911 dispatch shows that it was repeatedly reported that the crew members in the skiff were "ran over by a barge" and "hit by a barge."[62]

---

[57]    Exhibit 241, Demonstrative Timeline. *See also* Doc. 351, Trial Transcript, Vol. 1, at 217–19 (testimony of Captain Jay Rivera); Exhibit 17, the video from Verret Shipyard.

[58]    Doc. 351, Trial Transcript, Vol. 1, at 211–12 (Captain Rivera). *See also* Exhibit 241, demonstrative timeline.

[59]    Doc. 351, Trial Transcript, Vol. 1, at 186–87 (YRT's corporate representative Patrick Smith), 219–20 (Captain Rivera); Exhibit 24, photos of the skiff.

[60]    Doc. 352, Trial Transcript, Vol. 2, at 83–84 (Captain Rivera); Exhibit 131, Winemiller's drawing of the collision; Doc. 354, Trial Transcript, Vol. 4, at 29, 48–49 (Captain Schropp).

[61]    *See, e.g.*, Exhibit 8, Iberville Parish Sheriff's Office report, at CJM 1077. *See also* Doc. 351, Trial Transcript, Vol. 1, at 124–26 (deputy Mascaro).

[62]    Doc. 351, Trial Transcript, Vol. 1, at 124–26 (deputy Mascaro). *See also* Exhibit 8, Command Logs of Iberville Parish Office of Emergency Preparedness, at CJM 36 ("Hit by a barge"; "He remembers a barge coming over on top of them and then he popped out of the water.").

39.     Compelling evidence that the CECILE's tow struck the skiff came by way of testimony that two life jackets being worn by the skiff's crew at the time of the incident and bearing the KING's insignia were found stuck between the barges in the CECILE's tow.[63]

40.     The Court's conclusion is also supported by the expert testimony of Captain Jay Rivera which, on this point, the Court found credible and persuasive.[64]

41.     CJM has suggested that something other than its vessel and tow caused the skiff to sink. The Court is not persuaded. CJM's expert Captain Samuel Schropp testified that the skiff may have collided with sheet-piling bulkheads in the area.[65] Given the lack of corroborating evidence, [66] and in light of the mountain of evidence to the contrary outlined above, the Court finds this testimony speculative and rejects it.

42.     In conclusion, the Court finds that the great weight of the evidence shows that the CECILE's tow collided with YRT's skiff on February 10, 2020, at around 8:30 p.m.

**B.  Was CJM negligent in colliding with the KING's skiff?**

43.     As mentioned above, Claimants posit three main reasons why CJM is alone responsible for the collision: a) undertaking to perform too many tasks simultaneously causing him to be overworked, fatigued, distracted, and inattentive;[67] b) failing to post an additional lookout at the head of the tow or elsewhere;[68] c) failing to have the requisite number of radar devices and/or

---

[63]     Doc. 320, Pretrial Order, at 7, Established Fact 55. *See also* Doc. 351, Trial Transcript, Vol. 1, at 138 (deputy Mascaro) where May and Winemiller told Deputy Mancuso that they had been wearing their life jackets before the accident; *id.* at 218–19 (Captain Rivera).

[64]     Doc. 351, Trial Transcript, Vol. 1, at 218–20

[65]     Doc. 353, Trial Transcript, Vol. 3, at 202–05.

[66]     Doc. 354, Trial Transcript, Vol. 4, at 48–49 (Schropp concedes he has no evidence to support his theory).

[67]     Doc. 360, CPFFCOL, at 15–18, ¶¶ 36–40.

[68]     *Id.* at 19–31, ¶¶ 46–66.

failing to properly calibrate and/or monitor the radar that was on board the CECILE.[69] These three allegations will be considered in turn, but, in conclusion, the Court finds that CJM was not negligent in causing the collision.

### 1. Was Fitch distracted and inattentive because he was overworked and fatigued by undertaking too many jobs?

44.    In sum, Claimants argue that Fitch, in violation of CJM's TSMS, was acting in multiple capacities and performing multiple duties which should have been performed by multiple persons with the result that he was fatigued, distracted, or inattentive, resulting in his failure to see and avoid the skiff.[70]

45.    Fitch is the sole owner of CJM.[71] At the time of the incident, Fitch was simultaneously acting as vessel owner, vessel captain, and the shoreside management office for CJM.[72] In addition, he was acting as the wheelman on watch and "the sole lookout."[73] Claimants argue that this violated, *inter alia*, 46 C.F.R, § 15.705(d), which prohibits a captain from working more than 12 hours a day absent an emergency.[74] Claimants contend that operating a vessel in this manner created an unsafe condition, which rendered Fitch unable to keep a proper lookout as required by federal regulations.[75]

---

[69]    *Id.* at 32–37, ¶¶ 67–75.

[70]    *Id.* at 15–18, ¶¶ 36–40.

[71]    Doc. 351, Trial Transcript, Vol. 1, at 24 (Captain Fitch).

[72]    *Id.* at 24–25. *See also* Doc. 320, Pretrial Order, at 3–4, Established Facts 3–4, 13–14, 16.

[73]    Doc. 353, Trial Transcript, Vol. 3, at 135 (Captain Fitch).

[74]    46 C.F.R. § 15.705(d). *See also* Doc. 351, Trial Transcript, Vol. 1, at 222–26 (Captain Rivera).

[75]    Exhibit 239, Captain Rivera's expert report, at 14.

46.    Claimants acknowledge they offered no evidence as to the number of hours Fitch or other crew members worked aboard the CECILE or whether CJM complied with federal limitations regarding those hours.[76] However, Claimants contend that CJM violated 46 C.F.R. § 138.205(b)(3) by failing to conduct performance evaluations on the crew to ensure compliance with the company's TSMS.[77]

47.    Claimants maintain further that Fitch was required to designate a person ashore ("DPA") who had the responsibility to "continuously" perform certain functions, such as ensuring that the TSMS was being enforced, monitoring the safety and maintenance aspects of operating the CECILE, providing adequate resources and "shore-based" support, etc.[78] At the time of the incident and despite the fact that Fitch was aboard the CECILE and acting as its captain, wheelman, and lookout, he was simultaneously acting as the CECILE's DPA.[79]

48.    The Court finds that Fitch was not in violation of 46 C.F.R. § 15.705(d) for working more than 12 hours straight. Indeed, Claimant's expert Jay Rivera conceded that Fitch had been on duty for only two and a half hours when the CECILE was between the KING and Jack Miller's Landing.[80] Rivera also admitted he had seen no medical evidence that Fitch was fatigued.[81]

---

[76]    Doc. 360, CPFFCOL, at 16–17, ¶ 38.

[77]    *Id. See also* Exhibit 28, the CECILE's audit, at CJM000544. *See also* Doc. 353, Trial Transcript, Vol. 3, at 147–50 (Captain Fitch); Doc. 354, Trial Transcript, Vol. 4, at 57–59 (Captain Schropp).

[78]    Exhibit 39, Chester Marine's TSMS, section 4.1, at TBS000701-2; section 4.3, at TBS000703.

[79]    Doc. 351, Trial Transcript, Vol. 1, at 24–25 (Captain Fitch); *id.* at 222 (Captain Rivera).

[80]    Doc. 352, Trial Transcript, Vol. 2, at 48 (Captain Rivera).

[81]    *Id.*

49.    Although Claimants made much of phone records showing that Fitch had used his cell phone during this period of time,[82] Rivera acknowledged that the evidence only showed that Fitch made a "butt dial" some 15 minutes before the earliest estimate of the time of the accident.[83] This could not have played a role in the accident.

50.    The Court concludes that even if Claimants are correct that Fitch was violating CJM's TSMS in acting as the company's DPA and performing multiple duties aboard the vessel (including acting as lookout),[84] Claimants failed to prove that this caused him to be unduly fatigued, distracted, or inattentive at the time of the collision with the skiff or that this otherwise caused or contributed to the collision.

### 2.  Should Fitch Have Posted an Additional Lookout?

51.    In sum, Claimants argue that, given the prevailing conditions, Fitch was negligent for failing to post an additional lookout at the head of the tow or elsewhere.[85] Claimants argue that Fitch's failure to so was a violation of CJM's TSMS[86] as well as Inland Navigation Rule 5, 33 C.F.R. § 83.05.[87]

---

[82]    Claimants argue that CJM's TSMS prohibited the use of cell phones while navigating a vessel and specifically prohibited the use of cell phones while transiting narrow waterways. It also states that "[a] look-out shall never have a cell phone while on duty." Claimants maintain that, while transiting a narrow waterway and serving as (the only) lookout, Captain Fitch used his cell phone—within minutes from this incident—in violation of the TSMS policy designed to ensure that the person acting as a lookout pays full and undivided attention to safe navigation of the vessel. Claimant points the Court to the trial testimony of CJM's expert Captain Samuel Schropp who conceded that Captain Fitch did not act as a prudent lookout while on watch on February 10, 2020, because of his cell phone use. (Doc. 360, CPFFCOL, at 24–25, ¶ 56, citing Doc. 354, Trial Transcript, Vol. 4, at 41–43).

[83]    Doc. 352, Trial Transcript, Vol. 2, at 38–39. (Captain Rivera).

[84]    Exhibit 39, Chester Marine's TSMS, at TBS 001018 ("Lookouts should be well rested, *have no other duties*, and receive periodic training on proper lookout procedures." (emphasis added)).

[85]    *See generally* Doc. 360, CPFFCOL, at 19–31, ¶¶ 46–66.

[86]    *See, e.g.*, *id.* at 28–29, ¶¶ 62–63.

[87]    *See, e.g.*, *id.* at 31, ¶ 65.

52.     CJM counters that under the prevailing conditions, Fitch's decision to act as his only lookout was reasonable, ordinary, and consistent with CJM's TSMS and Rule 5.[88]

53.     Both the Inland Navigation Rule 5 and Chester Marine's own TSMS required Fitch, while at the helm of the CECILE, to see what was around him at all times and to keep a proper lookout.[89] Captain Fitch conceded this, although he insisted that, under the prevailing circumstances, an additional lookout was not needed.[90]

54.     Keeping a "proper" lookout by sight and hearing while navigating a vessel is obviously important in order to avoid colliding with other vessels and objects in the vicinity.[91] While a captain of the vessel always serves as a lookout, there are circumstances and conditions when that is insufficient and where additional means of lookout are needed.[92] These additional lookout means may include the proper use of a radar and/or placing another crew member at the bow of the vessel to perform lookout duties.[93]

55.     To determine whether an additional lookout is necessary, the industry practice as well as CJM's TSMS required Captain Fitch to consider—among other things—the following factors: (1) visibility, (2) traffic density, (3) the attention necessary when navigating in areas of increased vessel traffic, and (4) proximity of dangers to navigation.[94]

---

[88]     *See, e.g.*, Doc. 367, CJM's PFFCOL, at 19–21, ¶¶ 47–54.

[89]     Exhibit 39, Chester Marine's TSMS, section 7.23.4, at TBS001002. *See also* 33 C.F.R. § 83.05 (Rule 5).

[90]     Doc. 351, Trial Transcript, Vol. 1, at 30–31 (Captain Fitch).

[91]     *Id.* at 20–22 (Captain Fitch).

[92]     *E.g.*, Exhibit 39, Chester Marine's TSMS, sections 7.23.5, 7.23.5.1, at TBS001002–03.

[93]     Exhibit 39, Chester Marine's TSMS. *See also id.* at section 7.28, at TBS001016–17; *id.* at TBS001019.

[94]     *Id.* at section 7.23.5.1, at TBS001003; Doc. 351, Trial Transcript, Vol. 1, at 25 (Captain Fitch).

56.     Claimants argue that one of the variables favoring the need for an additional lookout was how Fitch's visibility was impacted by the blind spot created by the barges in front of the CECILE.[95]

57.     While on the Port Allen Route, the CECILE was pushing six empty barges arranged in a 3 long by 2 wide configuration,[96] which were light and floating almost entirely out of the water.[97]

58.     Each barge was about 200 feet long and 35 feet wide[98]—making the size of the vessel together with its tow a total of 700 feet in length and 70 feet in width.[99] The CECILE's wheelhouse was located approximately 615 feet from the front of its tow.[100]

59.     While Fitch testified that the size of his blind spot was approximately 150 to 200 feet,[101] Claimants disagreed, offering their expert Rivera's calculations that the CECILE's blind spot was at least twice the size estimated by Fitch—*i.e.*, approximately 417 feet.[102]

60.     CJM argues that Rivera's calculation was based on an inspection made while the CECILE was on blocks in a shipyard and was using an estimate as to the height of the CECILE's

---

[95]     Doc. 360, CPFFCOL, at 18–19, ¶¶ 41–45.

[96]     Doc. 320, Pretrial Order, at 3, Established Fact 5.

[97]     Doc. 351, Trial Transcript, Vol. 1, at 226–27 (Captain Rivera). *See also id.* at 17–18 (Captain Fitch).

[98]     *Id.* at 15–16 (Captain Fitch).

[99]     Doc. 320, Pretrial Order, at 3, Established Fact 6 (addressing only the size of the tow without the vessel itself); Doc. 351, Trial Transcript, Vol. 1, at 16–22 (Captain Fitch).

[100]     Doc. 351, Trial Transcript, Vol. 1, at 16–17 (Captain Fitch).

[101]     Doc. 353, Trial Transcript, Vol. 3, at 42–43, 93 (Captain Fitch). *See also* Doc. 352, Trial Transcript, Vol. 2, at 23 (Captain Rivera).

[102]     Exhibit 239, Captain Rivera's report, at 6. *See also* Doc. 351, Trial Transcript, Vol. 1, at 227–30 (Captain Rivera); Doc. 352, Trial Transcript, Vol. 2, at 23 (Captain Rivera).

wheelhouse at the time of the accident, meaning that his calculations could be off.[103] Furthermore, according to CJM's expert Captain Schropp, it is not customary to place a lookout on the head of the tow purely to mitigate the blind spot.[104]

61.     The Court has carefully considered the conflicting evidence on this issue and concludes that, regardless of whether Fitch's estimate or Rivera's calculation is correct, Fitch was reasonable under the existing circumstances not to place an additional lookout at the head of the tow. While both experts are qualified to provide expert testimony on this issue, the Court finds that of Captain Schropp more persuasive. Schropp has more actual experience than Rivera in performing duties identical to those being performed by Fitch. Indeed, Schropp testified that only 16 days after the accident in question, he was at the controls of a tug and tow transiting the exact waterway where the accident occurred. Like Fitch, he used an additional lookout as he went through the Bayou Sorrel swing bridge, but "when we cleared the bridge, I called them back to the boat and they went about their normal duties."[105]

62.     With respect to the blind spot created by the empty barges, the Court accepts the testimony of Captain Schropp that, while there may be circumstances when a blind spot will dictate that an additional lookout be placed at the head of the tow (e.g., entering a lock or going through a bridge),[106] this was not such an occasion. Indeed, Captain Schropp indicated that under ordinary circumstances like those existing on the night of the accident, he has not used a supplemental

---

[103]     Doc. 358, at 16, ¶ 31.

[104]     Doc. 353, Trial Transcript, Vol. 3, at 228–29.

[105]     *Id*. at 228. By contrast, Rivera has not operated or been on any boat of any size in the Port Allen Route. Doc. 351, Trial Transcript, Vol. 1, at 198.

[106]     Doc. 353, Trial Transcript, Vol. 3, at 228–29.

lookout while pushing tows with a much longer blind spot of 800 to 1000 feet.[107] In addition, Rivera testified that it is possible that the radar might have been able to see into the blind spot depending on the height of the radar (which is unknown).[108]

63.    As stated above, CJM's TSMS requires consideration of several factors in determining whether to use an additional lookout including visibility and anything that may "affect[ ] or restrict[ ] it."[109]

64.    Although at the time of the accident it was "pitch-dark",[110] the Court agrees with CJM[111] that darkness is not "restricted visibility" as defined and intended in the Rules of the Road.[112] Even Claimants' expert Rivera agreed. [113]

65.    CJM's TSMS also required Fitch to consider traffic density[114] and the attention necessary when navigating in areas of increased vessel traffic.[115] Here, the only vessels the CECILE met in this stretch of waterway other than the skiff were pushed in and tied up on the

---

[107]    *Id.*

[108]    Doc. 352, Trial Transcript, Vol. 2, at 95 (Captain Rivera).

[109]    Doc. 351, Trial Transcript, Vol. 1, at 22–23, 25–26, 74 (Captain Fitch). *See also* Exhibit 39, Chester Marine's TSMS, section 7.23.5.1, at TBS001003.

[110]    Doc. 352, Trial Transcript, Vol. 2, at 74 (Captain Rivera).

[111]    Doc. 358, CJM's Reply Memorandum, at 13–15, ¶¶ 25–30.

[112]    Rule of the Road 3(L), 33 C.F.R. § 83.03(l). That definition includes "any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms, or any other similar causes." *Id.*

[113]    Doc. 352, Trial Transcript, Vol. 2, at 44.

[114]    Exhibit 39, CJM's TSMS, section 7.23.5.1, at TBS001003; Doc. 351, Trial Transcript, Vol. 1, at 25 (Captain Fitch).

[115]    Exhibit 39, CJM's TSMS, section 7.23.5.1, at TBS001003; Doc. 351, Trial transcript, Vol. 1, at 25–26 (Captain Fitch).

banks.[116] Despite Claimants argument that the Port Allen Route is known to be an area frequented by small personal vessels, their support for this is Fitch's statement that there *could* be small vessels in the area.[117] Captain Schropp testified logically that, given that it was a February night and cold, "[t]here's not likely to be recreational boats and pleasure craft out."[118] The Court concludes that this factor of traffic density did not militate in favor of a supplemental lookout.

66.    Claimants argue there is another reason Fitch should have posted an additional lookout at the head of his tow. CJM's TSMS states that "[a] look-out shall be added . . . at any waterway intersection . . . [, but] the lookout may remain in the wheelhouse if visibility, weather[,] and traffic conditions permit." [119] Prior to the collision, the CECILE had passed an intersection where a starboard-side waterway cuts into the Port Allen Route.[120]

67.    But, as stated in the TSMS, the additional lookout is not required "if visibility, weather[,] and traffic conditions permit."[121] The Court finds that visibility, weather, and traffic were not such that Rule 5, CJM's TSMS, or reasonable care required the use of a supplemental lookout at that time.

---

[116]    Doc. 353, Trial Transcript, Vol. 3, at 44 (Captain Fitch). *See also id.* at 227 (Captain Schropp); Exhibit 13-a, Rose Point data from CECILE through the entire video.

[117]    Doc. 351, Trial Transcript, Vol. 1, at 73 (Captain Fitch).

[118]    Doc. 353, Trial Transcript, Vol. 3, at 220 (Captain Schropp).

[119]    Exhibit 39, CJM's TSMS, section 7.23.5, at TBS 1002.

[120]    Doc. 351, Trial Transcript, Vol. 1, at 255–57 (Captain Rivera); Doc. 352, Trial Transcript, Vol. 2, at 6 (Captain Rivera).

[121]    Exhibit 39, CJM's TSMS, section 7.23.5, at TBS 1002.

68.     In conclusion, the Court is persuaded by and accepts the opinion of Captain Schropp that Fitch kept a proper lookout and was in compliance with Rule 5 of the Rules of the Road, CJM's TSMS, and reasonable care.[122]

### 3.   Did Fitch Fail to Properly Have or Use Radar Equipment?

69.     Radar is a federal law-required aid in navigation that can, by providing instant readings, prevent incidents and loss of life and assist with safely navigating a vessel.[123]

70.     To serve its purpose, a radar must be (1) fully functioning, (2) properly scaled to the parameters of the waterway that is being navigated, and (3) continuously monitored by the wheelman on watch.[124]

71.     From the time it was purchased by Chester Marine until after this incident, the CECILE was equipped with only one radar.[125]

72.     Claimants argue that CJM's TSMS required that the CECILE be equipped with two radars.[126] Even if not required, Claimants maintain that the benefit of having two radars is that they can, respectively, be set for short- and long-range scanning and—by being able to issue different kinds of warnings—provide for a better situational awareness and a safer navigation.[127] Claimants

---

[122]    Doc. 353, Trial Transcript, Vol. 3, at 206.

[123]    Doc. 351, Trial Transcript, Vol. 1, at 48–49, 54 (Captain Fitch). *See also id.* at 234–35 (Captain Rivera).

[124]    *Id*. at 49–53 (Captain Fitch). *See also id.* at 237–38, 246–47 (Captain Rivera).

[125]    *Id.* at 44–45 (Captain Fitch). *See also id*. at 235 (Captain Rivera).

[126]    *Id*. at 53–56 (Captain Fitch); Exhibit 40, CJM's TSMS, at TBS 000209–10 ("Short and long-range scanning by radar should be used to identify targets before they get too close."); Exhibit 39, CJM's TSMS, section 7.28, at TBS 001017–18; Doc. 352, Trial Transcript, Vol. 2, at 92–93 (Captain Rivera).

[127]    Doc. 351, Trial Transcript, Vol. 1, at 232–34 (Captain Rivera).

insist that Captain Fitch's failure to equip the CECILE with two radars was not only a violation of the company's TSMS but was also not a prudent practice.[128]

73.    Claimants contend that federal regulations required Fitch to comply with CJM's TSMS[129] and that by failing to comply with the TSMS's radar policy, Fitch failed to comply with the Code of Federal Regulations. Claimants note that Fitch testified at trial that he thought that federal regulations required his vessel to use both short- and long-range radar.[130]

74.    Claimants also point the Court to Rule 6 as well as CJM's TSMS, which, they argue, required Fitch to know and consider the settings and limitations of his radar during navigation.[131]

75.    CJM counters that there is no federal regulation requiring a vessel like the CECILE to have two radars[132] and that its TSMS on this issue only applies in areas of restricted visibility, which this was not.[133]

76.    CJM points the Court to the testimony of Claimants' expert Rivera to the effect that federal regulations did *not* require the CECILE to have a second radar.[134] In addition, it notes that

---

[128]    *Id.* at 233–34 (Captain Rivera).

[129]    46 C.F.R. § 140.205(b) ("Towing vessels with a Towing Safety Management System (TSMS) must be operated in accordance with the TSMS applicable to the vessel."); Doc. 353, Trial Transcript, Vol. 3, at 110–111 (Captain Fitch); Doc. 352, Trial Transcript, Vol. 2, at 90 (Captain Rivera).

[130]    Doc. 351, Trial Transcript, Vol. 1, at 56–58, 76 (Captain Fitch).

[131]    Exhibit 39, CJM's TSMS, at TBS 000891 ("Recognize the importance of the correct use of navigational aids and knowledge of their limitations."). *See also* Doc. 351, Trial Transcript, Vol. 1, at 201 (Captain Rivera). *See also* Doc. 352, Trial Transcript, Vol. 2, at 98–99 (Captain Rivera); 33 C.F.R. § 83.06(b) (Rule 6).

[132]    Doc. 358, at 16, ¶ 33.

[133]    *Id.* at 16–17, ¶ 34.

[134]    *Id.* at 17–18, ¶ 37.

its own expert Schropp opined that CJM's TSMS did not require two radars[135] nor did federal regulations.[136]

77.    Though probably a basic model,[137] the radar aboard the CECILE was new and fully functioning at the time of this incident.[138]

78.    The Court concludes that, while Rivera testified persuasively that two radars would have been preferable to having only one,[139] federal regulations did not require the CECILE to have two radars despite Claimants' argument to the contrary.[140] Claimants' expert Captain Rivera agreed that federal regulations did not require a second radar on the CECILE at the time of the accident[141] and so did Captain Schropp.[142] This is also confirmed by a Subchapter M Compliance Survey on the CECILE conducted on September 17, 2019, which found that her navigation equipment was "satisfactory" and in compliance with 33 C.F.R. § 164.[143]

79.    While Rivera conceded the CECILE's one radar was compliant with Coast Guard regulations,[144] he opined that it violated CJM's TSMS.[145] Captain Schropp disagreed. While

---

[135]    *Id.* at 18, ¶¶ 38–39.

[136]    *Id.* at 19, ¶ 40.

[137]    Doc. 352, Trial Transcript, Vol. 2, at 91–92, 96–97 (Captain Rivera).

[138]    Doc. 351, Trial Transcript, Vol. 1, at 57 (Captain Fitch). *See also id.* at 246–47, 248–49 (Captain Rivera).

[139]    Doc. 351, Trial Transcript, Vol. 1, at 232–34.

[140]    *See, e.g.*, Doc. 360, CPFFCOL, at 32, ¶ 68.

[141]    Doc. 352, Trial Transcript, Vol. 2, at 92–93, 105.

[142]    Doc. 353, Trial Transcript, Vol. 3, at 241.

[143]    Exhibit 7, Vessel Survey Summary for 46 CFR 137 Vessel Compliance, at Bates stamp CJM0057.

[144]    Doc. 353, Trial Transcript, Vol. 3, at 241. *See also* Doc. 352, Trial Transcript, Vol. 2, at 93.

[145]    Doc. 352, Trial Transcript, Vol. 2, at 92–93, 105.

conceding that the language of the TSMS was ambiguous, Schropp opined that it did not require two radars.[146] Regarding this disagreement between the experts, the Court is persuaded by and accepts that of Captain Schropp.

80.     In conclusion, while two radars may have been preferable to having only one, the Court finds that having one properly functioning radar was acceptable, met the requirements of the Rules of the Road and CJM's TSMS, and was within the standard of care.

81.     Claimants separately fault Fitch and CJM for not setting the CECILE's radar at a longer range rather than a quarter of a mile.[147] Rivera testified that setting the radar at "a quarter of a mile range . . . gives you a couple of hundred feet of scanning in front of you . . . [which] defeats the purpose of the radar." [148] According to Rivera, this one-quarter mile range would have dramatically shortened the ability of the radar to pick up vessels outside the blind spot and consequently the ability to avert a collision.[149]

82.     Schropp concluded on the other hand that "a quarter mile is a good range to be working in this kind of close work"[150] and that setting the radar at a one-mile to two-mile range would provide no advantage and might carry downsides.[151]

83.     Here, the Court again agrees with Schropp. Particularly given Schropp's greater experience in performing this kind of work generally and specifically in doing this work in this

---

[146]    Doc. 354, Trial Transcript, Vol. 4, at 69–70 (Captain Schropp).

[147]    *See, e.g.*, Doc. 360, CPFFCOL, at 33–34, ¶ 70.

[148]    Doc. 351, Trial Transcript, Vol. 1, at 246 (Captain Rivera).

[149]    Doc. 352, Trial Transcript, Vol. 2, at 94–97 (Captain Rivera).

[150]    Doc. 353, Trial Transcript, Vol. 3, at 219–20 (Captain Schropp).

[151]    *Id.* at 220 (Captain Schropp).

specific location, the Court accepts his opinion that Fitch was not negligent in setting his radar at one-quarter mile.

84.    Claimants next argue that Fitch was negligent and in violation of both Rule 6 and CJM's TSMS for not "continuously" monitoring the radar.[152] The Court has carefully considered Fitch's testimony on this point and concludes that while in the wheelhouse, he met the requirements of both Rule 6 and CJM's TSMS by regularly checking the radar (along with his other equipment and looking ahead), although he admitted he "didn't constantly keep my eyes on the radar every second."[153]

85.    Claimants point to Fitch's deposition testimony that he did not "consistently" monitor the radar, which he changed on his errata sheet to the effect that he did consistently check it, and which he changed again at trial to the effect that he didn't.[154] The Court listened carefully to his testimony and accepts what Fitch said in open court, that although he didn't "didn't constantly keep my eyes on the radar every second," he did in fact regularly monitor the radar consistent with Rule 6 and CJM's TSMS while performing his other duties in the wheelhouse.[155] The Court does not interpret Rule 6 or CJM's TSMS to require that the person at the wheel of the vessel constantly look at the radar to the exclusion of looking ahead and checking his other equipment.

---

[152]    Doc. 360, CPFFCOL, at 35, ¶ 72.

[153]    Doc. 353, Trial Transcript, Vol. 3, at 60–64 (Captain Fitch).

[154]    *Id.* (Captain Fitch).

[155]    *Id.* at 60 (Captain Fitch).

86.    For these reasons, the Court finds that the CECILE was adequately equipped with radar and that the radar was set and monitored in a reasonable way given the prevailing circumstances.

87.    In conclusion, the Court finds that CJM was not at fault in causing this tragic accident but that, instead, the accident was caused exclusively by the combined fault of Standridge, May, and YRT.

## C.  Those at Fault in Causing Accident

88.    As mentioned above, the KING was manned by a crew of six: Captains Standridge and Evans, mate May, engineer Lashbrook, and deckhands Winemiller and Jackson.

89.    On the date of the accident, crew members began drinking that afternoon. At approximately 2:30 p.m., at Standridge's direction, May and Lashbrook took the KING's skiff to Jack Miller's to purchase cigarettes and alcohol.[156] While at Jack Miller's, they consumed shots of liquor and beer.[157] They also purchased bottles of liquor, which they brought back to the KING.[158]

---

[156]    Doc. 352, Trial Transcript, Vol. 2, at 120 (Testimony of Jamie May).

[157]    *Id.* at 121 (Testimony of Jamie May).

[158]    *Id. See also* Doc. 314-2, Testimony of Shannon Lashbrook, at 47 (46:11–13 on transcript) (discussing another incident in which they used the skiff to purchase liquor from a store). *See also* Exhibit 19, Video from Jack Miller's, Camera 5 showing May and Lashbrook purchasing liquor drinks from the bar, timestamped 2:22:30 p.m. to 2:23:30 p.m. Approximate times are from timestamp shown on video. The parties previously stipulated that the time stamp is actually 30 minutes slow, *i.e.*, if the video shows 2:22 p.m., the actual time was 2:52 p.m. *See also* Exhibit 19, Video from Jack Miller's Camera 11 (Video 1) at timestamp 2:06:40 p.m. to 2:08:05 p.m., showing May and Lashbrook purchasing beer and bottles of liquor.

90.     Upon returning to the KING, they proceeded to drink the alcohol in the vessel's galley.[159] At one point after May and Lashbrook returned, May was drinking a beer on the outside deck of the boat.[160] Standridge was also in the galley drinking alcohol.[161]

91.     Later that afternoon, Standridge and May organized a return trip to Jack Miller's.[162] Lashbrook decided not to go back to Jack Miller's because he believed it would "lead to problems."[163] Specifically, he believed the group was going back to consume more alcohol.[164]

92.     According to May, Standridge informed him that Evans knew the group was going to Jack Miller's.[165] Standridge informed Winemiller that Evans had authorized the trip to Jack Miller's.[166]

93.     Evans began his wheelhouse watch at approximately 5:30 p.m. When the skiff is in its davit (a cradle and crane apparatus used to launch and retrieve the skiff), it is visible from the KING's wheelhouse.[167] To get to the KING's wheelhouse, one must climb stairs on the outside of

---

[159]    Doc. 320, Pretrial Order, at 5, Established Fact 33.

[160]    Doc. 311-1, Testimony of Austin Winemiller, at 154–55 (153:10–154:18 on transcript). The Court notes that, in advance of trial, the parties were ordered to file into the record the deposition testimony to be considered by the Court. Doc. 300. *See also* Doc. 351, Trial Transcript, Vol. 1, at 4 (where the Court indicated it had read all depositions except Brandon Thornton). Therefore, when citing to deposition testimony, the Court will be referring to the record document numbers of the depositions instead of exhibit numbers).

[161]    Doc. 314-2, Testimony of Shannon Lashbrook, at 157 (156:3-8 on transcript).

[162]    Doc. 352, Trial Transcript, Vol. 2, at 140 (Testimony of Jamie May). *See also* Doc. 311-2, Testimony of Austin Winemiller, at 305 (655:2-4 on transcript).

[163]    Doc. 314-2, Testimony of Shannon Lashbrook, at 73 (72:1–8 on transcript).

[164]    *Id*. at 164 (163:10-19 on transcript). Note: Claimant's objection is overruled.

[165]    Doc. 352, Trial Transcript, Vol. 2, at 140 (Testimony of Jamie May).

[166]    Doc. 311-1, Testimony of Austin Winemiller, at 313–14 (312:3-313:16 on transcript). The Court overrules the objection by Claimants.

[167]    Exhibit 130, photograph from KING's wheelhouse showing the location of the skiff davit. *See also* Doc. 314-3, Testimony of Captain Evans, at 68–69 (68:25-69:6 on transcript).

the wheelhouse upon which the skiff and its davit are visible to anyone looking in that direction.[168] Before the group departed, Evans saw May retrieve the controller for the skiff davit while in the wheelhouse and did not question him on where he was going.[169]

94.    Standridge, May, Winemiller, and Jackson travelled in the skiff back to Jack Miller's at approximately 5:35 p.m. or 5:40 p.m. on February 10, 2023.[170]

95.    While at Jack Miller's, all four YRT employees consumed numerous alcoholic beverages:

> Standridge consumed "about three, four shots," three Long Island ice teas, and a beer.

> Winemiller consumed two shots, six Jager Bombs, a beer or two, and about five Long Island iced teas.

> May consumed the same number of shots as Standridge, beer, and a Long Island ice tea.

> Jackson had a shot of Patron tequila and partially drank a Long Island iced tea.[171]

96.    Extensive video from Jack Miller's shows all four crewmembers in the barroom consuming alcohol throughout the evening.[172] The alcohol consumption reported by Winemiller was consistent with Jack Miller's surveillance footage,[173] and with the post-accident BAC records

---

[168]    Doc. 314-3, Testimony of Captain Evans, at 70–71 (70:13–71:14 on transcript).

[169]    *Id.* at 338 (337:24–338:13 on transcript).

[170]    Doc. 311-1, Testimony of Austin Winemiller, at 33 (32:9–11 on transcript).

[171]    *Id.* at 60 (57:6-60:2 on transcript). The Court overrules Claimants' objection.

[172]    *See generally* Exhibit 19, the video from Jack Miller's Landing.

[173]    *Id.*

of May and Winemiller, according to Dr. Douglas Swift, CJM's expert in occupational and environmental medicine and medical review officer.[174]

97.    Dr. Swift was accepted by the Court as an expert, without objection, in the fields of occupational and environmental medicine and as a medical review officer.[175]

98.    YRT's internal documents show that Captains Standridge and Evans were not simply employees, but rather, were considered a "vital element of [YRT's] management team."[176]

> **2.0    SCOPE:**
>
> 2.1    This job description applies to all Captains employed at YAZOO RIVER TOWING.
>
> 2.2    Captains have the authority to carry out the responsibilities identified in this procedure.
>
> **3.0    JOB SUMMARY:**
>
> 3.1    The Captain is the highest authority on board a YAZOO RIVER TOWING motor vessel and is a vital element of YAZOO RIVER TOWING's management team.  The Captain will be relied upon to use necessary independent judgment and discretion to assure the efficient and safe operation of both the vessel and all crew members.

Excerpt from Exhibit 59, YRT Procedure Manual at Bates stamp YRT1392.

99.    Evans agreed that the captain on wheelhouse watch is responsible for the safety and well-being of his crew.[177]

100.    YRT's job description for its captains shows that Captains Standridge and Evans were "responsible for the safety, behavior, performance[,] and welfare of crewmembers **at all times**."[178] Moreover, the KING's captains were responsible to "supervise, reprimand, remove, and

---

[174]    *See* Doc. 352, Trial Transcript, Vol. 2, at 196–97 (Testimony of Dr. Swift).

[175]    *Id*. at 165–66 (Testimony of Dr. Swift).

[176]    Exhibit 59, YRT Vessel Captain Job Description, at Bates stamp YRT1392–93.

[177]    Doc. 314-3, Testimony of Captain Evans, at 150 (150:3–6 on transcript).

[178]    Exhibit 59, YRT Vessel Captain Job Description, at Bates stamp YRT1392-1393 (emphasis added).

discipline all crew members assigned to the motor vessel in [their] charge" and was "accountable for all crew members . . . on [YRT's] vessels" according to YRT's documents.[179]

101.    Evans testified that at some point he became aware that four of his crewmembers were missing and attempted to radio his crew: "Well, I made the radio check, and they never answered. So I don't know where they're at."[180] He then asked Lashbrook to locate the crew.[181] Lashbrook confirmed that he called May at 6:46 p.m. that evening to tell those at Jack Miller's that "Bill [Evans] was getting antsy and they needed to get back."[182]

102.    Despite claiming that he had no idea where his crew or the KING's skiff was and receiving no information from Lashbrook, Evans made no attempt to investigate or locate his crew and made no attempt to alert YRT's shoreside management of the situation.[183]

103.    Not only did Evans fail to take any action to locate his crew or alert YRT's shoreside management that four of its six employees on the KING were missing with the skiff, he made no attempt to ensure their safety prior to, or after, ordering them back to the vessel. It is undisputed that there were no lights on the skiff at the time of the incident. By the time Evans realized his crew was not on the KING, it was getting dark. Despite this, he made no inquiry into whether the crew had brought the lights of the skiff with them. [184]

---

[179]    *Id*. at Bates stamp YRT1397.

[180]    Doc. 314-3, Testimony of Captain Evans, at 141 (141:21–23 on transcript).

[181]    *Id*. at 151 (151:1–16 on transcript).

[182]    Doc. 314-2, Testimony of Shannon Lashbrook, at 77 (77:2–24 on transcript).

[183]    Doc. 314-3, Testimony of Captain Evans, at 154 (154:11–23 on transcript).

[184]    *Id*. at 328 (328:13–23 on transcript).

104.    To determine whether his crew had taken the skiff's navigation lights, Evans would have simply needed to look in a drawer in the KING's wheelhouse where they were stored.[185]

105.    In fact, Evans made no inquiry into the ability of the crew to return to the KING safely, despite his impression that the crewmembers were drunk. When the crewmembers in the skiff did not return following Lashbrook's call, Evans testified that he "had that gut feeling that they was up to no good."[186] He admitted that he believed the crewmembers under his authority were getting drunk.[187]

106.    Even though it was dark and he believed his crewmembers may have been drinking at a bar, Evans did not ask Lashbrook to call May again to determine if the skiff had lights or if anyone in the group was in a safe condition to operate the skiff.[188] Also, despite his order for the crew to return, Evans did nothing to alert area vessels that a skiff would be out on a dark waterway returning to the KING.[189]

107.    At some point while the KING's crew was at Jack Miller's, May and Winemiller were ready to leave. However, Standridge did not want to go back; rather, he wanted to patronize another bar.[190] Winemiller did not argue with Standridge because he felt like Standridge was "in charge" of him.[191]

---

[185]    *Id.* at 82 (82:3–15 on transcript).

[186]    *Id*. at 383 (383:23–24 on transcript).

[187]    *Id*. at 352–53 (352:8–353:8 on transcript).

[188]    *Id*. at 356 (356:1–8 on transcript).

[189]    *Id*. at 357 (357:4–7 on transcript).

[190]    Doc. 311-1, Testimony of Austin Winemiller, at 61–62 (60:9–25 on transcript).

[191]    *Id*. at 62 (61:1–13 on transcript). Claimant's objection is overruled.

108.    By this time, Winemiller considered himself "drunk."[192] When the group departed Jack Miller's, Winemiller described Standridge as "drunk," "stumbling," and requiring assistance to walk.[193] Winemiller similarly described May as "drunk" as the group left the bar.[194]

109.    May agreed that all of the crewmembers at Jack Miller's were returning to the KING to either go back on watch or rest up for their next watch.[195] May then asked for clarification and testified unequivocally that "yes, we were going back to work" when the skiff was returning to the KING that evening.[196] Winemiller provided similar testimony, stating that he was going to go back on watch once the skiff made it back to the KING.[197]

110.    According to YRT's U.S. Coast Guard 2692 Report of Marine Casualty, the skiff got underway at approximately 8:30 p.m.[198]

111.    The weight limit of the KING's skiff was 500 pounds, or 740 pounds including all persons and gear.[199]

112.    At the time crewmembers group boarded the skiff to return to the KING, they collectively weighed in excess of 900 pounds: Austin Winemiller testified that he weighed "about

---

[192]    *Id.* (61:14–16 on transcript).

[193]    *Id*. at 69 (68:7–18 on transcript). Claimants objection is overruled.

[194]    *Id*. at 70 (69:8–11 on transcript).

[195]    Doc. 352, Trial Transcript, Vol. 2, at 159–60 (Testimony of Jamie May).

[196]    *Id*. at 123 (Testimony of Jamie May)

[197]    Doc. 311-2, Testimony of Austin Winemiller, at 219, 317 (569:12–19 and 667:10–16 on transcript, respectively).

[198]    Exhibit 1, USCG 2692 Report of Melvin L. King, at Bates stamp YRT0375.

[199]    Exhibit 24, Photograph of Skiff Weight Limits, at Bates stamp YRT0455. *See also* Doc. 320, Pretrial Order, at 4, Established Fact 24.

300" pounds at the time of the incident;[200] Standridge's autopsy report lists his weight at 229 pounds;[201] Jackson's autopsy report lists his weight at 205 pounds;[202] and May's personnel file lists his weight as 173 pounds.[203]

113.    May was operating the skiff on its return trip to the KING.[204]

114.    At some point during its return trip, the skiff and the CECILE collided.

115.    Following the incident, May and Winemiller's Blood Alcohol Concentration ("BAC") was measured by the U.S. Coast Guard via breathalyzer approximately five hours after the incident. May was found to have a 0.138% BAC, while Winemiller was found to have a 0.027% BAC.[205] Approximately seven hours after the incident, May's BAC was 0.128% when he was tested via blood draw at Iberville Hospital.[206]

116.    Dr. Swift determined that based on May's pre-accident alcohol consumption and post-accident BAC, he would have had a BAC of approximately 0.20% at 8:30 p.m. on February 10, 2020—five times the U.S. Coast Guard's threshold for intoxication and over twice the legal limit for operating a vehicle or watercraft in Louisiana.[207]

117.    Dr. Swift testified that someone with a 0.20% BAC would "have some serious impairment," problems with "ataxia, meaning you have a wide-based gait," "problems with

---

[200]    Doc. 311-2, Testimony of Austin Winemiller, at 88 (438:4–6 on transcript).

[201]    Exhibit 72, Autopsy Report of Lloyd Standridge, at Bates stamp YRT0387.

[202]    Exhibit 73, Autopsy Report of Norsalus Jackson, at Bates stamp YRT1360.

[203]    Exhibit 93, Personnel File of Jamie May, at Bates stamp YRT1152.

[204]    Doc. 320, Pretrial Order, at 6, Established Fact 45.

[205]    *Id*. at 7, Established Fact 58.

[206]    *Id.*, Established Fact 59.

[207]    Doc. 352, Trial Transcript, Vol. 2, at 174 (Testimony of Dr. Swift).

judgment," and "to the untrained eye, it would appear as somebody who's seriously inebriated. Someone who's obviously drunk."[208] When asked about what effect May's estimated 0.20% BAC would have on his ability to operate the skiff, Dr. Swift testified, "he would be seriously impaired from operating any kind of vehicle, much less a boat."[209] Dr. Swift testified that one of the symptoms of someone with a 0.20% BAC would be having blackouts, which is consistent with the evidence and May's testimony that he could not remember what happened that night and that he blacked out.[210] According to Dr. Swift, of all the YRT employees at Jack Miller's, May "was in the worse [sic] position to operate the skiff."[211]

118.    Based on the number of drinks consumed by Standridge, and the testimony regarding his condition as the YRT employees left Jack Miller's, Dr. Swift concluded: "using the Coast Guard standard of 0.04% [BAC], he was significantly above that and was impaired."[212] Using a baseline threshold of 0.02% BAC per alcoholic beverage, Standridge's reported alcohol consumption would equate to a BAC of 0.12% to 0.14%.[213] According to Dr. Swift, someone with this BAC would have problems with vision, thought processing, and have "physical problems in terms of balance and coordination."[214] These issues are consistent with Winemiller's testimony that Standridge was drunk and needed assistance walking out of the bar.[215]

---

[208]    *Id.* at 174–75 (Testimony of Dr. Swift).

[209]    *Id.* at 178 (Testimony of Dr. Swift).

[210]    *Id.* at 178–79 (Testimony of Dr. Swift).

[211]    *Id.* at 175 (Testimony of Dr. Swift).

[212]    *Id.* at 182 (Testimony of Dr. Swift).

[213]    *Id.* at 181 (Testimony of Dr. Swift).

[214]    *Id.* at 181–82 (Testimony of Dr. Swift).

[215]    *Id.* at 182 (Testimony of Dr. Swift).

119.    The Court found Swift's testimony and opinions credible and well supported and accepts same. His conclusions are essentially uncontradicted.

## V.    CONCLUSIONS OF LAW

### A.  Jurisdiction

120.    The Court has jurisdiction over this matter by virtue of Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1333, admiralty and maritime jurisdiction.

### B.  Applicable Substantive Law

121.    The applicable substantive law is the general maritime law and the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq*.

### C.  Analysis

#### 1.   *Application of Limitation of Liability Act*

122.    This case arises in connection with CJM's Limitation of Liability action. The Limitation Act limits a vessel owner's liability to the value of the vessel, post casualty, plus any pending freight.[216] The limit is removed, however, if the negligence or unseaworthiness that caused the damage was within the "privity or knowledge" of the vessel owner.[217]

123.    This "privity or knowledge" element implies some sort of "complicity in the fault that caused the accident."[218] Privity means some "personal cognizance or participation in the fault or negligence which causes the loss," and knowledge results from actual or constructive knowledge of a "condition likely to produce or contribute to a loss."[219]

---

[216]    46 U.S.C. § 30523.

[217]    *Id.*

[218]    *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) (citations omitted).

[219]    *Greater New Orleans Expressway Comm'n v. Tug Claribel*, 222 F. Supp. 521, 524 (E.D. La. 1963).

124.    Knowledge refers not only to what the ship owner knows, but what it is charged with discovering.[220] "Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss."[221]

125.    When a ship owner seeks to limit its liability to the value of the vessel, the Limitation Act employs a burden-shifting approach. The individual claiming injury caused by the ship bears the initial burden of establishing that his injures arose as a result of the owner's negligence or the vessel's unseaworthiness. If successfully met, the burden then shifts to the ship owner to prove that the negligent act or the unseaworthy condition was not within its privity or knowledge.[222]

126.    In this case and for reasons detailed in its Findings of Fact, the Court finds that Claimants have failed to meet their burden of showing that the accident was the result of CJM's negligence or the unseaworthiness of the CECILE. There is therefore no need for CJM to prove its entitlement to limitation.

## 2. General Maritime Law Negligence

127.    Claimants allege that CJM was negligent in causing Standridge's death.

128.    "[N]egligence is an actionable wrong under general maritime law," and the elements of that tort are "essentially the same as land-based negligence under the common

---

[220]    *Brister*, 946 F.2d at 358.

[221]    *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789–90 (5th Cir. 2003) (quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1473–74 (5th Cir. 1991)).

[222]    *Brister*, 946 F.2d at 355. *See also Matter of Dredge Big Bear*, 525 F. Supp. 3d 731, 738 (M.D. La. 2021) (deGravelles, J.) (citing *In re Oil Spill by Oil Rig Deepwater Horizon*, 21 F. Supp. 3d 657, 753 (E.D. La. 2014) (citing *In re Signal Int'l*, 579 F.3d 478, 496 (5th Cir. 2009))).

law."[223] To prevail on a maritime negligence claim, a plaintiff must prove that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff sustained an injury.[224]

129.    "The standard of care, or duty, is a question of law that is established by statutes, rules, regulations, maritime custom, or general principles of negligence law."[225] The standard of care in maritime negligence cases is "reasonable care under existing circumstances."[226] Stated another way, under maritime law, the duty of care can be derived from duly enacted laws, regulations or rules, custom, or the dictates of reasonableness and prudence.[227] "However, negligence *per se* applies when a statute or regulation 'establishes a clear minimum standard of care' and replaces the general standard of care."[228]

130.    Under general maritime law, a party's negligence is actionable only if it is the "legal cause" of the claimant's injuries.[229] Legal cause requires that "the negligence must be 'a substantial factor' in the injury."[230] "The term 'substantial factor' means more than 'but for the negligence,

---

[223]    *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (citation and quotations omitted).

[224]    *Id. See also In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991); *Canal Barge Co. v. Torco Oil Co*., 220 F.3d 370, 376 (5th Cir. 2000).

[225]    *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 759 (E.D. La. 2019), *aff'd sub nom.*, *SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458 (5th Cir. 2022) (citations omitted).

[226]    *Id.* (citations and quotations omitted).

[227]    *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1972) (citing *Pa. R.R. Co. v. S.S. Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962)).

[228]    *SCF Waxler Marine*, 427 F. Supp. 3d at 759 (quoting *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234–35 (5th Cir. 1983)).

[229]    *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (citing *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978)).

[230]    *Id.* (quoting *Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985)).

the harm would not have resulted.'"[231] "In addition, foreseeability is also relevant to the proximate-cause determination."[232]

### 3. Summary of Court's Conclusions re Liability and Causation

131.    Utilizing these principles and for reasons detailed in its Findings of Fact, the Court finds that CJM was not negligent and that the sole and exclusive cause of Standridge's death was his negligence combined with that of May, Evans, and YRT.

132.    Even if CJM was negligent, given that the overloaded skiff was unlighted at approximately 8:30 p.m. on a February night, the Court finds that it is highly questionable whether a secondary lookout would have been able to see the skiff and warn Fitch in time for him to have successfully avoided the collision. Certainly, there is no convincing proof to that effect.

### 4. Statutory Violations and The Pennsylvania Rule

133.    Claimants invoke the *Pennsylvania* Rule in support of their claim.

134.    The *Pennsylvania* Rule instructs that a party who violates a statutory rule intended to prevent maritime accidents is presumed to have caused the accident.[233] "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not have been*."[234] Under *The Pennsylvania* Rule, if a vessel operator violates a Rule of the Road, the burden of proof switches to the operator to prove that said violation could not have been a cause-in-fact of the accident.[235]

---

[231]    *Id.* (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975)). *See also Chisholm v. Sabine Towing & Transp. Co*., 679 F.2d 60, 63 (5th Cir. 1982).

[232]    *SCF Waxler Marine*, 24 F.4th at 477 (citing *In re Signal Int'l*, 579 F.3d 478, 490 n.12 (5th Cir. 2009)).

[233]    *See Pennzoil Producing Co. v. Offshore Express, Inc*., 943 F.2d 1465, 1471–72 (5th Cir. 1991). *See also Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982).

[234]    *The Pennsylvania*, 86 U.S. 125, 136 (1874) (emphasis added).

[235]    *See Pennzoil*, 943 F.2d at 1472 (citing *Candies Towing*, 673 F.2d at 93).

135.    Claimants argue that Fitch and CJM violated, among others, Rule 5 and its own TSMS provision adopting same.[236]

136.    "[W]hat constitutes a proper look-out within the meaning of the statute is an issue of fact to be determined upon making explicit reference to 'prevailing circumstances and conditions.'"[237] "The duty to maintain a proper look-out, whether statutory or customary, varies with the circumstances of each situation."[238]

137.    Here, the *Pennsylvania* Rule does not apply to the claims asserted by the Standridge Claimants because they have failed to show that CJM or the CECILE violated a statutory provision.

138.    For reasons explained in its Findings of Fact, the Court also finds that the failure to post an additional lookout at the head of the tow, under the specific circumstances of this case, was not negligent nor was it a violation of Rule 5 or CJM's TSMS.

139.    Also, the Court finds there was no negligence or statutory violation in connection with the CECILE's radar or its use, that there was no negligence or statutory violation in connection with Fitch's undertaking multiple responsibilities at the time of the accident, and that, in any event, this was not a cause of the accident.

140.    In addition, for reasons stated in its Findings of Fact, The Court finds that Claimants failed to prove any other statutory violation or act of negligence on the part of CJM.

### 5.   *The Fault of Standridge, May, Evans, and YRT*

141.    Even if Claimants had proved some act of negligence on the part of CJM, it is clear that the vast majority of fault for this tragic accident lies with Standridge himself, May, and YRT

---

[236]    33 C.F.R. § 83.05 (Rule 5); Exhibit 39, Chester Marine's TSMS, section 7.23.4, at TBS001002.

[237]    *Great Am. Ins. Co. v. Tugs "Cissi Reinauer"*, 933 F. Supp. 1205, 1216 (S.D.N.Y. 1996).

[238]    *Schumacher v. Cooper*, 850 F. Supp. 438, 449–50 (D.S.C. 1994).

(both for its vicarious liability for the conduct of May and Evans and also its independent fault for fostering a culture that permitted the free use of alcohol and drugs both on and off the vessel during its employees' normal work hours). Indeed, the Court finds that this collective fault is the sole and exclusive reason for the collision.

142.    As is detailed in the Court's Findings of Fact, Standridge was clearly drunk at the time he was killed. His drinking that afternoon with those under his command, organizing the second trip to Jack Miller's Landing, his continued consumption of copious amounts of alcohol while at Jack Miller's, and then his either causing or allowing him and his crew to travel back to the KING in the dark in an unlighted and overloaded vessel was grossly negligent.

143.    The Court rejects Claimants' argument that Standridge's intoxication was not a substantial contributing factor in the collision.[239] While Standridge was not at the controls of the skiff at the time of the collision, his intoxication was a significant contributing reason which caused or allowed the trip to proceed via boat back to the KING and a likely contributing reason he allowed May, also highly intoxicated, to take the helm. But whether these decisions were due to intoxication or just bad judgment, they constitute gross negligence.

144.    The Court rejects Claimants' argument that Standridge was pilot (not co-captain) of the KING and had no authority over his fellow crew members on this "recreational" skiff. The evidence convinces the Court that Standridge and Evans were co-captains and one or the other would be in command of the vessel during their respective watches. But whether pilot or captain, he had authority over the others in the skiff at the time of the collision.

145.    Whether those on the skiff were in the course and scope of their employment at the time of the collision is a factor in deciding whether Standridge had legal command over the other

---

[239]    *See* Doc. 357, at 21–22.

crew members beneath him. The evidence also shows that Standridge and the others on the skiff were in the course and scope of their employment on their way back to the KING.

146.    In *Beech v. Hercules Drilling Co., L.L.C.*, the Fifth Circuit made clear that the ingestion of an intoxicant in violation of a company's policy does not, by itself, remove a worker from the course and scope of his employment.[240] The violation of such a policy is, as the Court in *Beech* stated, "relevant" but "not dispositive."[241]

147.    On this issue, the Court finds *Diamond Offshore Management Co. v. Guidry* persuasive.[242] There, the Texas Supreme Court reversed a jury verdict in favor of an intoxicated seaman who was killed in an automobile accident while allegedly returning to his drilling vessel after a two-hour drinking stint at a karaoke bar, finding that the jury had not been properly charged on the issue of course and scope of employment. The decedent's employer argued that because the decedent worked on the drilling rig for two to three hitches, he was not entitled to take advantage of the *Aguilar v. Standard Oil* line of cases.[243] The Court responded that "[a]ssuming *Sellers* is correct, Guidry's two-hour venture from his rig mid-hitch is not so far removed from his work there as to be, as a matter of law, outside the scope of his employment."[244]

148.    In remanding the case for trial with proper instructions and jury interrogatories to be given to the jury on the issue of course and scope, the court stated,

---

[240]    *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 576 (5th Cir. 2012) (citing with favor *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1079–80 (10th Cir. 2010) (holding that a worker who had violated employer's policies by using methamphetamine while driving employer's truck on assigned route was within the course and scope of her employment)).

[241]    *Id.*

[242]    *Diamond Offshore Mgmt. Co. v. Guidry*, 171 S.W.3d 840 (Tex. 2005).

[243]    *Id.* at 842–43 (relying on *Sellers v. Dixilyn Corp.*, 433 F.2d 446, 448 (5th Cir. 1970)).

[244]    *Id.* at 843.

While there was thus some evidence that Guidry was in the course of his employment, that evidence was not conclusive. The jury was free to disbelieve the plaintiff's expert. Auth also testified that employees did not further Diamond's interests when they were off-duty and that going to a bar would not be business-related. McWilliams' credibility was in question because Diamond had terminated his employment under circumstances he believed were not justified. Further, a seaman's misconduct while on shore leave, such as intoxication, may take him outside the course of employment. Thus, the issue whether Guidry was in the course of his employment at the time of the accident was one for the jury.[245]

149.    But the Court's conclusion would be the same whether Standridge was a pilot or captain at that time and whether he was or wasn't in the course and scope of his employment, since he was the senior member of those who made the trip to Jack Miller's (indeed, he organized the trip) and he had a personal as well as professional responsibility to himself and his fellow crew members to act with due care for his safety and that of the others. He had the practical, if not the legal, authority to influence the conduct of his fellow crew members. That obligation was profoundly disregarded by him with tragic consequences for him and Norsalus Jackson.

150.    Furthermore, Standridge knew, or certainly should have known, of the requirement that the skiff have a lookout, have proper lighting, and not be overloaded. The Court finds that these failures constitute violations of Rules of the Road 23 (lighting)[246] and Rule 5 (lookout)[247] for which both Standridge and May are responsible, and, in addition, the vessel violated Rule 16 (right-of-way).[248]

---

[245]    *Id.*

[246]    Doc. 353, Trial Transcript, Vol. 3, at 239–40 (Captain Schropp).

[247]    The intoxicated May was the only lookout, as all others in the skiff were facing toward the stern.

[248]    *Id.* at 237–38 (Captain Schropp).

151.    But the Court need not rely on the *Pennsylvania* Rule to establish causation. The Court rejects Claimants argument that these violations were not the proximate cause of the accident[249] and finds that the overwhelming evidence shows that these violations and the conduct which gave rise to them were significant contributing factors in the collision.

152.    Jamie May was heavily intoxicated at the time the return trip to the KING began. Yet, he negligently undertook or agreed to pilot the skiff. He was in no condition to act as a lookout nor were his companions. Even if they had been, however, he had no additional lookout facing forward at the time of the collision. Thus, May also violated Rule 5.

153.    In addition, he violated Rules 9(a)(i)[250] and 9(b),[251] and May should have been able to see the CECILE's lights long before a secondary lookout on the CECILE would have been able to see or hear the skiff (Rule 16).[252]

154.    In sum, The Court finds that May was grossly negligent by: (1) operating the skiff while significantly intoxicated; (2) failing to ensure the skiff was displaying the appropriate navigation lights; (3) failing to operate the skiff as far as safe and practicable to its starboard side; (4) failing to keep a lookout; and (5) failing to act in a manner expected of a prudent seaman by consuming alcohol while on the job.

---

[249]    *See, e.g.*, Doc. 357 at 17–19, 22–25.

[250]    33 C.F.R. § 83.09(a)(i) requires a vessel in a narrow channel to "keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable."

[251]    33 C.F.R. § 83.09(b) requires vessels under 20 meters in length to "not impede the passage of a vessel that can safely navigate only within a narrow channel or fairway."

[252]    33 C.F.R. § 83.16 requires vessels to "take early and substantial action to keep well clear" of other vessels.

155.    These failures were a substantial contributing factor in the collision, and the Court rejects Claimants' argument to the contrary.[253]

156.    The Court finds that even if Evans did not know that Standridge and the others had left in the skiff (and there is direct testimony that he did), he clearly should have. The skiff would have been stored in plain view of the wheelhouse.

157.    But even if he was initially unaware that they had left the KING, he became aware later that they had. Although he was suspicious that they had been drinking ("up to no good"), he failed to investigate further and simply told them to return and, when they did, to bring him some crawfish from Jack Miller's Landing.

158.    Had Evans investigated properly, he would have discovered that these crewmembers were intoxicated and taken the reasonable steps necessary to get them back to the KING safely.

159.    In summary, the Court finds that Captain Evans was negligent by: (1) failing to monitor the whereabouts of his crew; (2) failing to alert YRT shoreside management that four of his crewmembers were missing; (3) failing to alert YRT shoreside management that he believed his crew was "up to no good" and likely consuming alcohol; (4) failing to ensure that area vessels knew the skiff would be on the waterway returning to the KING; (5) failing to ensure that one of his crewmembers was sober or in a position to safely operate the skiff; and (6) failing to ensure that the skiff had navigation lights for its return trip.

160.    The Court finds that Evans's negligence was a substantial contributing cause of the accident.

---

[253]    *See* Doc. 357, at 15–28.

161.    Evans was clearly in the course and scope of his employment for YRT at the operative time (no one contests otherwise).

162.    As stated above, the Court finds that Standridge and May were both in the course and scope of their employment at the time of the collision.

163.    In addition to whatever role YRT's vicarious fault played in the accident, the Court finds that it was independently at fault for allowing a culture of alcohol and drug use on board its vessel to exist.[254] The evidence in this regard is discussed in detail in its Findings of Fact.

## VI.    CONCLUSION

In conclusion, and for the reasons stated, the Court finds that CJM is without fault in causing the accident sued upon and is entitled to exoneration from liability. Judgment will be signed accordingly.

Signed in Baton Rouge, Louisiana, on September 28, 2023.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[254]    *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527 (11th Cir. 1990).